No. 21136.

THE WESTERN COLORADO POWER COMPANY, ET AL. *v.*
THE PUBLIC UTILITIES COMMISSION OF THE
STATE OF COLORADO, ET AL.
(411 P.2d 785)

Decided February 14, 1966. Rehearing denied March 14, 1966.

264

Irvine and Baucom, Loesch & Kreidler, Barry & Boyle, for plaintiff in error The Western Colorado Power Company.

Lee, Bryans, Kelly & Stansfield, Bryant O'Donnell, for plaintiff in error Public Service Company of Colorado.

Duke W. Dunbar, Attorney General, Frank E. Hickey, Deputy, Robert N. Trunk, Assistant, for defendants in error The Public Utilities Commission of the State of Colorado, et al.

Raphael J. Moses, John J. Conway, John A. Hughes, R. Jerry Bennett, for defendant in error Colorado-Ute Electric Association, Inc.

*En Banc.*

Mr. Justice Moore delivered the opinion of the Court.

We will refer to the parties as follows: to The Western Colorado Power Company as Western; the Public Service Company of Colorado as Public Service; the

Public Utilities Commission as the Commission; and the Colorado-Ute Electric Association, Inc. as Colorado-Ute.

On May 11, 1962, Colorado-Ute filed an application with the Commission for a "Certificate of Convenience and Necessity." The object of the application was to permit Colorado-Ute to construct near Hayden, Colorado, a steam electric generating plant with a nominal rating of 150,000 kilowatts, together with associated transmission lines and related facilities necessary to deliver power to certain new customers it sought to serve at wholesale. On June 14, 1962, Colorado-Ute filed a petition for an order of the Commission authorizing it to execute notes payable to the United States of America in an amount not to exceed $22,876,000 and mortgages to secure the notes in order to finance the project.

Public Service and Western filed protests in opposition to Colorado-Ute's requests and the matters were consolidated for hearing. Protests to those applications which were filed by Public Service and Western generally alleged that each was a public utility subject to the jurisdiction of this Commission engaged, among other things, in the generation, transmission and distribution of electric power and energy at wholesale and otherwise throughout various areas of the State of Colorado; that all or a portion of the lines, plant, and facilities proposed to be constructed by Colorado-Ute would cause physical and uneconomical duplication of the lines, plants, and systems of the companies which had been lawfully constructed and dedicated to the public use; that the companies then, and for many years past, had maintained electric generating facilities and transmission lines and related facilities adequate and sufficient to meet all present and future needs of their customers and service areas, and held themselves out as ready, willing and able to render wholesale electric service to Colorado-Ute or any of its members; that there did not exist any need nor necessity for the con-

struction of the proposed plant and facilities of Colorado-Ute and that if such construction was authorized by the Commission it would result in substantial damage to the companies and their electric consumers.

Subsequent to hearing, the Commission entered its order authorizing the construction of the Hayden plant and the financing thereof, but denying authority to construct certain of the facilities originally requested. Western and Public Service thereafter commenced certiorari proceedings in the district court, and from the judgment therein entered, affirming the Commission's decision, they bring writ of error here.

Colorado-Ute is an incorporated rural electric co-operative association engaged in generating and transmitting electric energy as a wholesaler. It proposes to sell electric energy to various customers it denominates "members" as well as to the Bureau of Reclamation, a nonmember. It further proposes to dedicate its facilities to whatever use the public convenience and necessity require, including the wheeling of power to protestants Public Service and Western. It is federally financed by the Rural Electrification Administration under the Rural Electrification Act of 1936 (Title VII, USCA 901). Eleven of its members are "distribution members" and distribute electrical energy directly to their users. Of the two other members, the Arkansas Valley G & T generates and transmits energy for its three "distribution members," and the Salt River Project Agricultural Improvement and Power District provides both electric and water service in the area surrounding Phoenix, Arizona. Salt River is not a cooperative but is a quasi-governmental organization incorporated under the laws of the State of Arizona.

Both Public Service and Western have been rendering electric service in Colorado since long prior to the time Colorado-Ute was first incorporated or ever constructed any generation and transmission facilities. Western serves in southwestern Colorado in the general area

from Durango to Paonia, Colorado, and Public Service serves in a large area of the eastern slope of Colorado, including Denver, as well as in portions of western Colorado such as the San Luis Valley, Grand Junction, Rifle, and other specific areas within the state.

On this writ of error, contentions of Western and Public Service fall into three general categories: (1) That Colorado-Ute did not prove the need, demand, or necessity required by the law of public convenience and necessity for power to be provided by the Hayden Plant; (2) that the financial arrangements of Colorado-Ute with the Rural Electrification Administration are illegal; and (3) that numerous errors of an evidentiary, procedural, and administrative nature were committed by the Commission, all to the prejudice of Western and Public Service.

The first category consisted of six sub-categories, each of which, it is said, points to error because the action of the Commission, and the trial court in affirming the Commission, contravened the fundamental concept of public utility law relating to public convenience and necessity. In this respect it is asserted: (1) That the evidence established that proposed new customers of Colorado-Ute already had an adequate power supply and that these customers would merely change their source and commence taking their power from Colorado-Ute; (2) that the construction of the plant would duplicate service made available by Western and Public Service as well as other electric suppliers presently rendering such service; (3) that the estimates of power costs submitted by Colorado-Ute found no support in the evidence; (4) that the generation and transmission of energy at less cost, assuming the record established such fact, is not a factor in establishing public convenience and necessity where reliance upon cheaper energy as basis for certification would be destructive of the concept of regulated monopoly; (5) that it would not be in the public interest to permit the construction

of the plant where it would put Colorado-Ute in a debt position of more than 100%; (6) that the Commission erred in receiving evidence concerning alleged benefits which would accrue to the Colorado River Basin fund as a result of the construction of the plant where the reception of such evidence was based upon the construction of a 600,000 k.w. plant and basing its decision thereon when the application was for a plant of only 150,000 k.w.

The Commission (by a two to one vote) found that public convenience and necessity demanded the construction of the Hayden Plant and its related facilities. This determination is the subject of attack by writ of error in this court. The record consists of some eight thousand pages with over twenty-five hundred pages of testimony. One hundred and twenty-four exhibits were offered. It would unduly lengthen this opinion to discuss in detail each facet of the evidence presented, and it is not necessary to do so.

The record discloses that the Colorado-Ute was organized in 1941 by a group of rural electric distribution associations on the Western Slope, but remained inactive for some years. In 1952 Colorado-Ute was reorganized, and it obtained a loan from the Rural Electrification Administration to construct transmission lines and a generating plant to supply the electric requirements of its then members. Upon the completion of the construction of this plant, known as the Nucla plant, Colorado-Ute commenced serving, on a wholesale basis, four distribution cooperatives located in the southwestern portion of the state. At the time of the hearing before the Commission there was then pending an application by Colorado-Ute to commence serving a fifth member located near Grand Junction, Colorado.

The alleged purpose to be served by the construction of the Hayden plant is to supply the electric requirements not of its five members but of thirteen members. This would have the effect of making Colorado-Ute the

wholesale supplier of electric energy to a large portion of the State of Colorado, as well as to a small portion of the State of Wyoming and the State of Utah, and a large supplier to the Salt River Project in Arizona. Each of these eight potential new customers of Colorado-Ute is now receiving service from other sources, and the existing Nucla Plant of Colorado-Ute is adequate to serve the requirements of the five earlier members. It is thus apparent that Colorado-Ute seeks to commence rendering electric service on an expanded basis in areas it has not heretofore served, to customers it has never before served, and to customers and in areas where electric service is being supplied and is available from other existing sources.

Wholesale electric service to many of the proposed new distribution cooperative customers of Colorado-Ute was for many years supplied by other utilities in the area, and later by the Bureau of Reclamation, and all parties to this proceeding are distinctly in the wholesale electric business. Arkansas G & T is an organization similar to Colorado-Ute and supplies wholesale electric service to three distribution cooperatives. Arkansas Valley obtains its power by purchase from municipal electric plants and from its own generating plant located near Canon City. This, in turn, it wholesales. The effect of the Commission's decision is to substitute Colorado-Ute as the source of supply for all of these proposed new members. For instance, those receiving wholesale service from the Bureau of Reclamation will terminate such purchases; those proposed new customers which have generating plants will dispose of those plants by one means or another; and those new customers which purchased from municipalities will no longer do so. Arkansas G & T, which only recently completed the construction of its Canon City generating plant, will no longer obtain any power from its own plant but instead will purchase from Colorado-Ute.

Although there was much conflicting testimony with respect to the ability of the Bureau of Reclamation to continue meeting the wholesale requirements of the proposed new members of Colorado-Ute, all three Commissioners concurred in a finding that Bureau power — the existing source of supply of many of these cooperatives — was adequate for the foreseeable future. In addition the record clearly reflects that the Arkansas G & T plant is more than adequate to meet the anticipated demands of its customers for a considerable period of time. It is also shown by the record that Public Service and Western have adequate generating facilities with which to meet the demands of any wholesale requirements in their respective areas should existing sources prove insufficient.

Under these circumstances, it is apparent that the generating capabilities of existing electric suppliers in the State of Colorado are more than adequate to supply increased electrical needs without the addition of the Hayden plant, which was to be constructed only for the purpose of providing service to substitute for that already being rendered.

Confronted with the fact that there was no need for Colorado-Ute to expand its operations to serve customers already being served, the two concurring Commissioners evolved a theory that such new customers could pick and choose between (1) continuing service from existing suppliers, (2) purchasing wholesale requirements from certificated investor-owned utilities, or (3) purchasing from Colorado-Ute if it obtained authority to construct the Hayden plant. This is shown by the following statement of Commissioner Horton:

"That Ute, the applicant herein as we interpret the record, has to elect from three sources of power available to take care of their present and future needs:

"1. To purchase power from the investor-owned utilities represented by the Protestants herein;

"2. To avail themselves of Bureau Power from The Colorado River Storage Project; and

"3. To construct a steam electric plant at Hayden."

QUESTIONS TO BE DETERMINED

First. *Does public convenience and necessity require the construction and operation of the Hayden plant in view of the acknowledged adequacy of existing service?*

We answer this question in the negative. The State of Colorado has long been dedicated to the principle of "regulated monopolies" in the conduct of public utility operations. This principle has been the public policy of this state since the year 1913 when the Public Utilities Act of the State of Colorado was first adopted. The concept has never varied in a long line of decisions of this court. We will comment upon some of those decisions later in this opinion, but it is here observed that as recently as September 13, 1965, in the case of *Colorado Transportation Company v. The Public Utilities Commission of the State of Colorado,* 158 Colo. 136, 405 P.2d 682, this court again reminded the P.U.C. of the concept of regulated monopoly as follows:

"It would seem to us that probably the real reason for the Commission's falling into error in the instant case is the fact that even at this comparatively late date it professes to be uncertain as to whether utility regulation of motor carriers in Colorado is based upon the theory of 'regulated competition' or 'regulated monopoly.' As illustrative thereof, during the course of the hearing, one Commissioner opined as follows:

" 'We have a peculiar situation here and I hardly know how to rule. Our federal concept, as I under (sic) it, has been on the theory of regulated competition. If you can tell me what the Colorado concept is — I don't know. We have got rulings that indicate both ways.'

"And then in its formal findings and order, the Commission stated as follows:

" 'The Colorado [Public Utilities] Commission, for the past twenty years, has regulated motor carriers for hire

under the belief that the theory of regulated competition was in compliance with our law. We will not attempt to resolve this question as it would appear it is a matter of law which we feel is beyond our jurisdiction and should be left to the courts. * * *'

"It is too late to debate the merits of the competing principles of 'regulated competition' and of 'regulated monopoly' in the field of utility regulation. Despite the claimed uncertainty of the Commission, the State of Colorado has long been wedded to the concept of regulated monopoly in the field of public utility regulation. For the benefit of the Commission, a few of the many cases which say so, are: *Ephraim Freightways, Inc. v. Public Utilities Commission,* 151 Colo. 596, 380 P.2d 228; *Donohue v. Public Utilities Commission,* 145 Colo. 499, 359 P.2d 1024; *Denver & Rio Grande Western Railroad Co. v. Public Utilities Commission,* 142 Colo. 400, 351 P.2d 278; and *Archibald v. Public Utilities Commission,* 115 Colo. 190, 171 P.2d 421. For better or for worse, then, Colorado is quite definitely committed to the principle that public utility regulation is based upon the theory of a 'regulated monopoly.' "

There are a great many other cases adhering to the regulated monopoly principle and no purpose would here be served by reference to all of them. Suffice it to say that these cases clearly show that the regulated monopoly principle is not consistent with the theory of the case upon which the two concurring Commissioners based their decision.

The statute which is determinative of the basic issue in this case is C.R.S. 1963, 115-5-1, which provides as follows:

"115-5-1. New construction — extension. — (1) No public utility shall begin the construction of a new facility, plant, or system, or of any extension of its facility, plant, or system, without first having obtained from the commission a certificate that the present or

future public convenience and necessity require or will require such construction. Sections 115-5-1 to 115-5-4 shall not be construed to require any corporation to secure such certificate for an extension within any city and county or city or town within which it shall have theretofore lawfully commenced operations, or for an extension into territory, either within or without a city and county or city or town, contiguous to its facility, or line, plant, or system, and not theretofore served by a public utility providing the same commodity or service, or for an extension within or to territory already served by it, necessary in the ordinary course of its business. * * *"

The above statute makes mandatory proof of public convenience and necessity prior to the construction of any new plant or system, subject to certain exceptions. It is obvious that none of the exceptions are applicable in this case, and Colorado-Ute has never contended to the contrary. This statute is the foundation of the regulated monopoly principle and as this court has observed on many occasions it was designed to prevent duplication of facilities and competition between utilities, and to authorize new utilities in a field only when existing ones are found to be inadequate. *Ephraim Freightways, Inc. v. Public Utilities Commission,* 151 Colo. 596, 380 P.2d 228; *Donohue v. Public Utilities Commission,* 145 Colo. 499, 359 P.2d 1024; *Public Service Company v. Public Utilities Commission,* 142 Colo. 135, 350 P.2d 543; *Public Utilities Commission v. Donahue,* 138 Colo. 492, 335 P.2d 285; *Public Utilities Commission v. Loveland,* 87 Colo. 556, 289 Pac. 1090. It is our view that Commissioner Zarlengo correctly understood the force and effect of the statute and its application to the issues in this case as indicated by the following quotation from his dissent:

"It is obvious that the objective of the statute is to avoid duplication of sources of power in the public in-

terest. Why should the consuming public pay for, and maintain, two sources of power if one will do, or 3 sources of power if 2 will do, etc., etc.? The law, therefore, subjects proposals for new, or expanded, construction to the judgment of the Commission and in such cases the Applicant must make an affirmative showing that the purpose of the statute will not be defeated.

\* \* \*

"It is incumbent upon the Applicant 'to tip the scales' in the direction that duplication will not result from its proposed action. In doing this it must show that there is a need for the additional construction which necessarily involves showing that the existing sources are, and will, not be reasonably adequate and available."

It is impossible for this court to reconcile its previous pronouncements with the statement of Commissioner Horton that Colorado-Ute could pick and choose the manner in which it availed itself of public utility service, one important kind of which is the furnishing of wholesale power, a service performed for many years by both protestants, and one as entitled to the protection of its regulated monopoly status as any other. Allowing customers to pick and choose from whom they will obtain any public utility service obviously creates rather then prevents duplication, fosters rather than controls competition, and totally disregards the principle that inadequacy of existing facilities must be shown in order to authorize a new service.

It appears from the record that Colorado-Ute initially recognized that it was required to satisfy these basic principles of public convenience and necessity if it were to prevail. Much evidence was produced in an effort to show that the Bureau of Reclamation did not have sufficient power to meet the requirements of Colorado-Ute's proposed new customers. As indicated, each of the three Commissioners found to the contrary, and to illustrate the complete lack of proof of this essential

ingredient of public convenience and necessity we quote from the Commission's decision.

Commissioner Horton stated:

"* * * However, the Bureau assures Ute that power and energy will be made available to them as preference customers by Act of Congress, from the Colorado River Storage Project."

Commissioner Bjelland agreed in the following language:

"* * * Even as the record clearly establishes the fact that Ute needs more power, it equally clearly establishes that Ute's immediate needs and reasonable future needs can be satisfied by purchasing hydroelectric power from the Colorado River Project. Ute and its member cooperatives are preference customers for power from this project, and preference power for the Upper Division States will in all liklihood *not be fully utilized until the mid 1970's. This source of power is stable and the price is reasonable. * * *"* (Emphasis supplied.)

Commissioner Zarlengo, in his dissent, stated:

"Giving consideration to all of the testimony upon this point, it is obvious that the requirements of Northern Division preference customers which they are entitled to obtain from the Bureau of Reclamation under the preference laws of the United States *can be supplied by the Bureau from the Colorado River Storage Project through the year 1970, and perhaps through 1975."* (Emphasis supplied.)

The evidence of the capacity or ability of Arkansas Valley to continue supplying its customers' requirements was clearly established by the record. Thus, existing sources of supply to the proposed new customers of Colorado-Ute were conclusively shown to be adequate. It should also be noted that the determination of the adequacy of existing sources was made without giving any consideration to other potential suppliers such as plaintiffs in error who were ready, willing and able to render this service in their respective service areas.

We agree with Commissioner Zarlengo when he points

out in his dissenting opinion the lack of evidence of public convenience and necessity:

"It appears that the applicant has founded its case, in the main, on the premises that if the Hayden Plant and facilities be authorized, the power and energy produced will find a market, all the while ignoring substantial proof and competent evidence as to the availability (58) or non-availability of power and energy from existing sources and the reasonableness of its cost to the consumers. To say the least, it has glossed over this phase, or, at most, tendered evidence which is vague, indefinite and uncertain."

To affirm the decision of the Commission authorizing the construction of the Hayden plant where existing service was already adequate, would require a complete departure by this court from its previous decisions. The fundamental misconception of Colorado-Ute is its failure to recognize that, under regulation, existing suppliers are entitled to serve all desiring service, whether they be existing or potential customers. In our early decision in *Public Service Company v. Loveland, supra,* we protected the right of the existing utility to render electric service to *potential customers* even though the utility was not then serving them. A recent case in point is the case of *Public Utilities Commission v. Verl Harvey, Inc.,* 150 Colo. 158, 371 P.2d 452, where the Commission had granted a certificate for an expanded motor carrier operation without finding that existing carriers were inadequate or unable to perform the desired service. The existing carriers had protested the expanded authority sought by one Watson because they were ready, willing and able to perform the service even though none of the customers involved were then served by them. The following quotation from that opinion is particularly suited to the issues here:

"Presented to the commission in opposition to granting of any authority to Watson was the contention of protestants, supported by uncontradicted evidence, that

licensed carriers were ready, able and willing to fill the requirements of shippers, including the needs of those who have been using the service of Watson. Instead of making a finding that additional facilities were or were not needed, the commission expressly avoided answering this very important question, and stated:

" 'That the services which Applicant seeks to provide are necessary for the public convenience and necessity even though there are other carriers who allege (though the Commission does not so find from the record) that they can adequately fill the vacuum which would result from cessation of operations by the Applicant.' "

The decision of this court in *Donahue v. Public Utilities Commission, supra,* is also particularly significant in view of the contentions here raised by Colorado-Ute. In that case the Commission had failed to find that service by existing carriers was inadequate but granted the authority requested on the basis that there was sufficient business to support the new carrier. In rejecting that concept of public convenience and necessity, and again adhering to the absolute requirement that the Commission find inadequacy of service before granting a new certificate, we said:

"* * * The finding by the commision that, '* * * nor can we say that his [protestant's] service is adequate at this time,' falls far short of a finding of failure reasonably to supply the need. There is not sufficient competent evidence in this record to warrant any such finding. The finding which is called the 'serious question' confronting the commission, namely, 'Is there sufficient business to warrant two certificated carriers?' amounts to a repudiation of the basic concept upon which the structure of Public Utility Commission powers is based, namely, that of regulated monopoly."

All in all, on review of the record and the two concurring opinions of the majority of the Commission, it is apparent that no real effort was made to decide this case in a manner consistent with the pertinent statute

(C.R.S. 1963, 115-5-1) and our many decisions construing and interpreting it. Instead, an approach of "non-regulation" was employed, as appears from the following statement quoted from the Commission's findings:

"We do not feel that the 'Commission should assume the burden of speculation on a matter so vital to thousands of consumers when the Colorado-Ute Board has made a management decision to construct the Hayden Plant."

Our statement in the case of *Consolidated Freightways Corporation v. Public Utilities Commission*, 158 Colo. 239, 406 P.2d 83, bears repeating:

"Regulation — not non-regulation — has been declared to be in the public interest."

In summarizing the factual situation presented by the record, it is apparent that,

1. adequate electric service is already available in the State of Colorado for the needs and necessities of the proposed new customers of 'Colorado-Ute; therefore

2. the construction of the Hayden Plant, requiring an investment of approximately thirty million dollars, is not necessary to supply any present or foreseeable future electric requirements, and Colorado ratepayers should not be required to support it; and

3. affirmance of the district court's judgment and the decisions of the Commission would sanction a duplication of existing electric facilities which are adequate to supply the needs of the public; and

4. the affirmance of the district court and Commission decisions by this court would be inconsistent with the doctrine of regulated monopoly and would, as we stated in *Public Utilities Commission v. Verl Harvey, supra,* render regulation "wholly ineffective and meaningless."

Having discussed the Colorado law of Public Convenience and Necessity as a crucial point upon which the decision in this case turns, we must inquire whether there are any other considerations which should, for

reasons special to this case, absolve Colorado-Ute from the necessity of proving that the public convenience and necessity requires construction of the Hayden plant. If such considerations exist it must be admitted at the outset that the result would emasculate the concept of regulated monopoly and the entire Colorado structure of public utility law.

SECOND. *Does Colo. Sess. Laws 1961, ch. 198, 115-1-3(2), which generally conferred jurisdiction over cooperatives in the Public Utilities Commission, violate the Constitution of Colorado or of the United States?*

██ This question is answered in the negative. At the commencement of its consideration of this case, the court requested and received an additional oral argument from counsel, upon questions concerning the constitutionality of the 1961 amendments (particularly Session Laws of Colorado 1961, ch. 198, 115-1-3(2)) to the Public Utility Law, and the consequent investiture of the Public Utilities Commission with jurisdiction of cooperatives.

Prior to the occasion of this oral argument Colorado-Ute had not questioned the constitutionality of the Act, had filed its application before the Commission and followed the matter through Commission, district court, and briefs in this court without suggesting unconstitutionality.

██ The power to regulate entities affected with a public interest is a function of the police power of the state, and any business or activity which is affected with a public interest may be so classified and so regulated. *Eachus v. People,* 124 Colo. 454, 238 P.2d 885; *Nebbia v. New York,* 291 U.S. 502; *Munn v. Illinois,* 94 U.S. 113; *Idaho Power & Light v. Blomquist,* 141 Pac. 1083 (Idaho 1914); *Boone County Rural Electric Membership Corporation, et al. v. Public Service Commission of Indiana, et al.,* 239 Ind. 525, 159 N.E.2d 121; *Kentucky Utilities Company v. Public Service Commission,* 252 S.W.2d 885 (Ky. 1952); *Dairyland Power Cooperative v. Brennan,*

248 Minn. 556, 82 N.W.2d 56; *Orndoff v. Public Utilities Commission*, 135 Ohio State 438, 21 N.E.2d 334.

■ The record shows that Colorado-Ute in wholesaling electric power intends to serve various classes of customers including consuming cooperatives, other wholesaling cooperatives, governmental or quasi-governmental bodies (Salt River), and even an arm of the Federal Government, the Bureau of Reclamation, together with any other applicants for service if approved by the Commission. We hold that its business is affected with a public interest and is subject to regulation under the police power of the State of Colorado, and that such regulation does not violate either the Constitution of the State of Colorado or the Constitution of the United States.

The 1961 amendments to the Public Utilities Law of the State of Colorado are valid, enforceable, and constitutional. C.R.S. 1963, 115-1-3 (2) provides:

"Every co-operative electric association, or nonprofit electric corporation or association, and every other supplier of electrical energy, whether supplying electric energy for the use of the public or for the use of its own members, is hereby declared to be affected with a public interest and to be a public utility and to be subject to the jurisdiction, control, and regulation of the commission and to the provisions of articles 1 to 7 of this chapter."

This statute is couched in clear and cogent terms. It makes no exceptions. *"Every* co-operative electric association" is a public utility, as well as all other electric suppliers.

■ No issue has been raised in this case that Colorado-Ute is not a "co-operative electric association." By the terms of the statute, therefore, it is subject to the "jurisdiction, control and regulation" of the Public Utilities Commission, and we so hold.

Colorado-Ute in its application before the Public Util-

ities Commission readily admits that it is a public utility. The application contains the following:

"Applicant is a corporation organized and existing under and by virtue of the laws of the State of Colorado subject to the jurisdiction of this Commission under the provisions of H.B. No. 245 passed by the Colorado Legislature and signed by the Governor on April 23, 1961. * * *

"The public convenience and necessity requires the construction of said generating plant, transmission lines, and related facilities, and the interconnections herein described."

These allegations are consistent only with the concept that Colorado-Ute is a public utility, and are inconsistent with any idea that it is concerned only with the needs and requirements of its co-operative members.

Western and Public Service admit that Colorado-Ute is a public utility. The legislature has declared in no uncertain terms that it is a public utility. It furnishes electrical energy which is used by countless consumers in a very large segment of this state. The widespread interest of the public is clearly shown, and this court should not declare the legislative act to be void, especially when the parties themselves admit that it is valid and enforceable.

There is an abundance of authority to support the classification of a wholesaler of energy to distributors as a public utility. *North Carolina Public Service Co., et al. v. Southern Power Co.,* 282 Fed. 837; *Boone County Rural Electric Membership Corporation, et al. v. Public Service Company of Indiana, et al.,* 239 Ind. 525, 159 N.E.2d 121; *Orndoff v. Public Utilities Commission,* 135 Ohio State 438, 21 N.E.2d 334; *Industrial Gas Company v. Public Utilities Commission of Ohio,* 135 Ohio St. 408, 21 N.E.2d 166; *Wisconsin Traction Company v. Green Bay & Miss. Canal Co.,* 188 Wisc. 54, 205 N.W. 551.

The co-operative form of organization obviously has nothing to do with the question of what constitutes the

public convenience and necessity, or with the obligation of any utility to prove public convenience and necessity in accordance with the theory of regulated monopoly as expressed by the statutes of the State of Colorado and the decisions of this court. These statutes were enacted for the benefit of the public as a whole, and result in the granting of regulated status to a supplier of a commodity essential to the public interest. Under regulation, an electric consumer need not be a member of a co-operative to secure its service. Likewise a consumer located in an area exclusively served by such co-operative must take its service if indeed service is to be received at all. The form of organization delivering service makes no difference whatever to these consumers and the legislature recognizes reality when it specifically places the co-operatives under the regulatory arm of the state.

As long ago as 1926 this court, in the case of *Davis v. Public Utilities Commission*, 79 Colo. 642, 247 Pac. 801, determined that in examining an activity affected with the public interest it would look to substance and ignore form. In that case the court said:

"In determining whether a business is that of a common carrier 'the important thing is what it does, not what its charter says.' *Terminal Taxicab Co. v. Kutz, et al.*, 241 U.S. 252, 36 Sup. Ct. 583, 60 L. Ed. 984, Ann. Cas. 1916D, 765. A service may effect (sic) 'so considerable a fraction of the public that it is public in the same sense in which any other may be called so.... The public does not mean everybody all the time.'"

That wholesaling of electric power *is* affected with a public interest is well illustrated by the fact that if it were not so, Public Service or Western could spin off their generation and transmission functions to a subsidiary corporation, and thus evade and defeat the regulation of wholesale power rates, and thereby the rates to the ultimate consumer. Certainly the legislature no

more intended this result in the case of the co-operatives than it did in the case of the investor-owned utilities.

THIRD. *Does the fact that Colorado-Ute, a co-operative, has but thirteen members who are also co-operatives, warrant treatment of a different kind than that which would be applicable to any other kind of membership?*

This question is answered in the negative. We find no merit to the argument that as a co-operative whose members are other co-operatives, Colorado-Ute is merely an extension or adjunct of these member co-operatives so that its act is the act of its members, and for that reason Colorado-Ute is not subject to regulation.

We observe first that Colorado-Ute is in all respects a separate legal entity; it has its own distinct corporate organization, including directors and officers; and it deals with its customers, whether co-operatives or not, by means of long term power supply contracts. It is obvious that the decision to construct the Hayden plant was the decision of Colorado-Ute itself rather than its members as of the time the decision was made to build the Hayden plant. At that time it had no more than five members. Many of its new members did not become members or agree to power purchase contracts until shortly before the Commission hearing commenced, which was long after the decision to construct the plant was made. It is, therefore, apparent that Colorado-Ute, instead of being the alter ego of its members, is the complete master of its own destiny. Thus the concept of it as a mere extension or adjunct of the distribution co-operative members has no legal or factual basis and is a forced and artificial one. But even if we accepted the artificial idea of the nature of Colorado-Ute as an alter ego, so to speak, of its members, no different application of the legal principles here involved would result. There is no contention in this case that those customers of Colorado-Ute that are themselves co-operatives are

*not* public utilities and are *not* subject to the jurisdiction of the Public Utilities Commission.

Any such co-operative, which had not theretofore generated its own electricity, would be required to secure Commission approval if it proposed to construct such a plant (C.R.S. 1963, 115-5-1), and of course if it came before the Commission with such purpose it, like any other utility, would be required to prove that the public convenience and necessity demanded such construction because it would then be engaging in a wholly new and distinct type of utility service (generation) theretofore supplied by "a public utility providing the same commodity or service."

Similarly, Colorado-Ute did not go before the Commission seeking to extend *existing* facilities to serve *existing* customers. The record shows clearly it had ample facilities to serve all of its then existing customers and that the purpose of its application was to expand its service from a small area in southwestern Colorado to cover substantially all Western Slope as well as many thousands of square miles in the southeastern portion of the state.

In closing the discussion of the nature of Colorado-Ute, it may be remarked that its suggested status as an adjunct of its individual co-operatives is belied by what occurred. None of the distributive co-operatives were parties to the proceedings and their representatives did not appear before the Commission to give evidence in their own behalf that the public convenience and necessity required construction of the Hayden plant, and this lack cannot be supplied by mere speculation on the part of either Commission or court.

Secondly, Colorado-Ute is not by any means "a co-operative of cooperatives." As we have already noted, of its thirteen members eleven are distribution co-operatives, one is a wholesale co-operative of a nature similar to that of Colorado-Ute itself, and the thirteenth — and by far the largest of all of its members — Salt

River, is a governmental or quasi-governmental agency of a nature completely different from that of all other members.

It is thus clearly apparent that the business of Colorado-Ute is affected with a special interest far beyond that of its eleven distributive co-operatives and therefore is not immune from regulation.

FOURTH. *Does the fact that the Hayden plant has already been completed require an affirmance of the judgment of the trial court?*

The answer is "No." The court is aware that the Hayden plant is now constructed. This fact, however, cannot subvert the legal principles upon which our decision is based nor be allowed to defeat the doctrine of regulated monopoly to which Colorado subscribes. It is clear that both Colorado-Ute and the REA, its financing associate (who was not before the Commission) recognized that construction of the Hayden plant during litigation was attended with substantial risk, and they engaged in such activity with full knowledge of the possible consequences.

For good reason, no contention is made that the construction precludes decisions by this court. It is the law that when the interest of the public is concerned it is not only the right but the duty of an appellate court to determine the issues, regardless of interim construction. *Bruce v. Leo,* 129 Colo. 129, 267 P.2d 1014; *Reserve Life Insurance Company, Dallas, Texas v. Frankfather,* 123 Colo. 77, 225 P.2d 1035; *Golden v. People ex rel.,* 101 Colo. 381, 74 P.2d 715; *Pallas v. Johnson,* 100 Colo. 449, 68 P.2d 559; *Jackson v. Denver Producing and Refining Company,* 96 F.2d 457 (10th Circuit 1938); *Southern Pacific Terminal Company v. Interstate Commerce Commission,* 219 U.S. 498, 55 L. Ed. 310; *Franks v. State Highway Commission,* 182 Kan. 131, 319 P.2d 535; *Moore v. Smith,* 160 Kan. 167, 160 P.2d 675; and *Moore v. White,* Okla., 323 P.2d 352.

Colorado-Ute solemnly assured the Commission and

district court that in the event of the reversal of the Commission order, Colorado-Ute and its Colorado consumers would escape scatheless from adverse economic consequences because Salt River of Arizona would then assume the obligation for the Hayden plant. The record discloses that counsel for Colorado-Ute wrote the Commission under date of March 21, 1963, specifically stating that Salt River had agreed to take the Hayden plant off the hands of Colorado-Ute at no loss to Ute in the event that "some court" subsequently ruled that the certificate should not be issued.

The district court warned applicant and its members and its participating financiers of the possible consequences of proceeding pendente lite, in the following language:

"If the cooperative members are willing to pledge their credit and the United States and the Salt River Project are prepared to spend the money to build this Plant in Colorado upon their expectation that the decision of the Public Utilities Commission will be sustained in the Courts, the progress of the work during the litigation would appear to cause no damage in law to anyone."

In the unlikely event of loss it will not be borne by ultimate consumers of electricity, but will fall upon those who saw fit to go ahead notwithstanding the manifest uncertainty of their position and the express provisions of Section 4 of the Rural Electrification Act in which the Congress of the United States provided:

"That no loan for the construction, operation, or enlargement of any generating plant shall be made unless the consent of the State authority having jurisdiction in the premises is first obtained. Loans under this section and section 5 shall not be made unless the Administrator finds and certifies that in his judgment the security therefor is reasonably adequate and such loan will be repaid within the time agreed."

When litigation in accordance with the statutes and

procedures of the state in question is in progress, it needs no citation of authority to establish that consent of the state authority to the construction has not been obtained, nor could any reasonable person believe that security for the proposed loan is adequate and that the loan will be repaid in due course when the very right to construct the plant is still in litigation. The Court of Appeals for the 4th Circuit had occasion to examine related questions in the case of *Greenwood County v. Duke Power Company*, 107 Fed.2d 484, and said at pages 488-489:

"The question of law as to whether the Public Works Administrator could lawfully make a loan and grant to a county for the construction of a project such as this was a new one and one upon which the opinion of able lawyers and judges was divided. It was in the interest of all parties concerned that the question be authoritatively settled before monies were advanced and expenditures made * * *."

"* * * The mere pendency of the suit raising such questions was sufficient to prevent advancement of funds by an officer of the United States, irrespective of the granting of the temporary injunction."

 Before concluding this opinion we desire to make additional comments on the Commission's decision for the purpose of future reference and guidance. The Commission is primarily a fact finding body and has few, if any, of the attributes of an appellate court. It is required by law to make findings of fact upon which any necessary judicial review of its actions can be predicated. In the instant case, the lack of findings of fact by the Commission and the confusion arising from the separate statements by the respective commissioners as to what, if any, facts were agreed upon by the Commission as a regulatory body, have had grave consequences.

In order to get the matter before this court, the lack of proper findings first required counsel to prepare and

file exceedingly long briefs and appendices and it next caused this court a massive amount of drudgery. Both of these results have contributed to delay in disposing of a case which is affected with great public interest.

The judgment of the trial court is reversed and the cause remanded with directions that it vacate its judgment and thereafter direct the Commission to vacate and set aside its decision No. 60156.

Mr. Chief Justice Sutton concurs in the result.

Mr. Justice Frantz dissents.

Mr. Justice Frantz dissenting:

By holding that Colorado-Ute is what it cannot be, the majority has effectively incapacitated it as the supplier of energy for its members. The reasoning of the majority, simply stated, is this: Colorado-Ute is a public utility. Its existence as a public utility is offensive to the law of this state relating to regulated monopolies. This conclusion flows from the finding of the Commission, supported by evidence, that there were other sources available from which the members of Colorado-Ute could obtain energy. There being other sources, the Hayden plant is a duplication of facilities, which effectually closes the door to any determination of convenience and necessity for its existence, the sine qua non for its justification.

Once the court accepts the premise that Colorado-Ute is a public utility, that which is then said logically follows. It is with the determination that Colorado-Ute is a public utility that I am in disagreement. In the operation of the Hayden plant, Colorado-Ute is not a public utility, and my view in this respect arises from three basic considerations: (1) Colorado-Ute is a cooperative corporation made up of thirteen members which are, in turn, corporate cooperatives, and for these thirteen members it will manufacture and sell electrical energy at wholesale; (2) the order of the Commission confined

the sale of energy at wholesale to the thirteen members, thereby removing Colorado-Ute from the public utility concept of dedicating its property to public service or use; and (3) this court should not put an interpretation on the facts of this case which makes invalid our constitutional provision and the statutes relating to public utilities.

If in the operation of the Hayden plant, Colorado-Ute is not a public utility, a majority opinion to the contrary would have a devastating effect upon a legitimate enterprise for which there has been a very substantial investment. The importance of this decision as it relates in general to our public utilities law and in particular to the continuation of the Hayden plant as a source of electrical energy places a heavy responsibility upon this court.

By Article XXV, the Constitution of Colorado vests the legislature with complete authority over public utilities "as presently or as may hereafter be defined * * * by the laws of the State of Colorado. . . ." For reasons which will be hereinafter stated, I take the position that any definition of a public utility must remain within the traditional concept of the term; that the legislature may not by fiat make enterprises, which would not fall within the traditional meaning of the term, public utilities.

Presently the term "public utility" is defined by statute. The definitive statute is C.R.S. 1963, 115-1-3. It provides:

"(1) The term 'public utility' * * * includes every common carrier, pipeline corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, person or municipality operating for the purpose of supplying the public for domestic, mechanical, or public uses, and every corporation, or person *now or hereafter declared by law to be affected with a public interest,* and each thereof, is hereby declared to be a public utility . . .

"(2) Every co-operative electric association, or non-profit electric corporation or association, and every other supplier of electrical energy, whether supplying electric energy for the use of the public or for the use of its own members, is hereby declared to be affected with a public interest and to be a public utility . . ." (Emphasis supplied.)

Were the constitution and statute to be construed as applying to private corporations not serving the public, their invalidity would immediately arise because:

(1) such construction would unjustly interfere with private property rights in contravention of the due process clause of the 14th Amendment to the federal constitution;

(2) such construction would infringe upon private contractual rights which are protected by Article 1, Section 10 (1) of the federal constitution; and

(3) such construction would be in derogation of the Enabling Act, which recognizes implicitly property rights and the freedom to enter into private contracts.

Selecting only electric cooperatives for regulation as a public utility violates the equal protection clause of the 14th Amendment, and by reason thereof subsection 2 of C.R.S. 1963, 115-1-3, cannot be sustained.

In any consideration of the problem, it is necessary to revisit some fundamental law regarding public utilities. What makes an enterprise a public utility, and why is a public utility under some restraints which are not applicable to corporations not serving the public?

"A corporation becomes a public service corporation, subject to regulation by the department of public service, only when, and to the extent that, *its business is dedicated or devoted to a public use.* The test to be applied is whether or not the corporation holds itself out, expressly or impliedly, *to supply its service or product for use either by the public as a class or by that portion of it that can be served by the utility, or whether, on the contrary, it merely offers to serve only particular*

*individuals of its own selection."* (Emphasis supplied.)
*Inland Empire Rural E. v. Department of Public Service,*
199 Wash. 527, 92 P.2d 258. In support of this proposi-
tion the Supreme Court of Washington cites a host of
cases from states of the Union.

Our court has recognized the theory of law that a
public utility embraces the idea that property must be
devoted to a public use before it may be regulated as
such. A public utility is "a system of works operated
for public use, examples of which are telephone, street
railway, water, electric light and power, gas works, and
other systems." *Searle v. Town of Haxtun,* 84 Colo. 494,
271 Pac. 629.

The court asked itself in *Colorado Utilities Corpora-
tion v. Public Utilities Commission,* 99 Colo. 189, 61
P.2d 849:

"Is Moffatt Coal Company, under the facts presented,
a public utility within the meaning of the Public Util-
ities Act?"

and answered:

"* * * Moffatt Coal Company made no dedication of
its property or any part thereof to a public use; it made
no offer, and did not hold itself out, to serve the public
as a public utility as such term is used in the statute
above mentioned . . ."

To be a public utility "a business or enterprise must
be impressed with a public interest *and* * * * those en-
gaged in the conduct thereof must hold themselves out
as serving or ready to serve *all members of the public,*
who may require it, to the extent of their capacity. The
nature of the service must be such that all members of
the public have an *enforceable right to demand it."* (Em-
phasis supplied.) *Englewood v. Denver,* 123 Colo. 290,
229 P.2d 667; *Public Utilities Commission v. Colorado
Co.,* 142 Colo. 361, 351 P.2d 241.

Nowhere is the difference between operations subject
to police power regulation and those subject to public
utility regulation so well demarcated as in the leading

case of *Allen v. Railroad Commission,* 179 Cal. 68, 175 Pac. 466, 8 A.L.R. 249. Since its language is precise and definitive, I quote from it extensively:

"* * * In its broadest sense everything upon which man bestows labor for purposes other than those for the benefit of his immediate family is impressed with a public use. No occupation escapes it, no merchant can avoid it, no professional man can deny it. As an illustrative type one may instance the butcher. He deals with the public; he invites and is urgent that the public should deal with him. The character of his business is such that under the police power of the state it may well be subject to regulation, and in many places and instances is so regulated. The preservation of cleanliness, the inspection of meats to see that they are wholesome, all such matters are within the due and reasonable regulatory powers of the state or nation. But these regulatory powers are not called into exercise because the butcher has devoted his property to public service so as to make it a public utility. He still has the unquestioned right to fix his prices; he still has the unquestioned right to say that he will or will not contract with any member of the public. What differentiates all these activities from a true public utility is this, and this only: That the devotion to public use must be of such character that the public generally, or that part of it which has been served and which has accepted the service, has the right to demand that that service shall be conducted, so long as it is continued, with reasonable efficiency under reasonable charges. *Public use, then, means the use by the public and by every individual member of it, as a legal right.*" (Emphasis supplied.)

Whether an electrical plant is a public utility "depends upon what it does and not upon the powers conferred upon it by charter." *Colorado Utilities Corp. v. Public Utilities Commission, supra.* It is commonplace doctrine that "a private corporation cannot be converted into a public service corporation by mere legis-

lative fiat. What it does is the important thing, not what it, or the state, says it is." *Inland Empire Rural E. v. Department of Public Service, supra.*

The statutory provision that enterprises "affected with a public interest" are public utilities has a narrow meaning — one in keeping with the customary concept of what constitutes a public utility. "Under our statute defining public utilities, Cobb's pipe-line operations must be impressed with a public interest. That it is not so impressed is readily determined by the fact that plaintiffs here, and the public, have no right to demand the service. * * * It is a reiteration of the principles laid down in the Englewood case, supra, to say that *before Cobb and his operations could be classified as a public utility, he must hold himself out as serving, or ready to serve, all members of the public who may require it."* (Emphasis supplied.) *Parrish v. Public Utilities Commission,* 134 Colo. 192, 301 P.2d 343.

In so limiting the scope of the term, "affected with a public interest," our court is in harmony with the much-quoted definitive language of former Chief Justice Taft in the case of *Wolff Packing Co. v. Court of Industrial Relations,* 262 U.S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A.L.R. 1280, approved and followed in *People ex rel. Industrial Commission v. Aladdin Theatre,* 96 Colo. 527, 44 P.2d 1022. There Justice Taft said:

"Businesses said to be clothed with a public interest justifying some public regulation may be divided into three classes:

"(1) Those which are carried on under the authority of a public grant of privileges which either expressly or impliedly imposes the affirmative duty of rendering a public service demanded by any member of the public. Such are the railroads, other common carriers and public utilities.

"(2) Certain occupations, regarded as exceptional, the public interest attaching to which, recognized from earliest times, has survived the period of arbitrary laws

by Parliament or colonial legislatures for regulating all trades and callings. Such are those of the keepers of inns, cabs, and gristmills. [citing cases]

"(3) Businesses which, though not public at their inception, may be fairly said to have risen to be such, and have become subject in consequence to some government regulation. They have come to hold such a peculiar relation to the public that this is superimposed upon them. In the language of the cases, the owner, by devoting his business to the public use, in effect, grants the public an interest in that use, and subjects himself to public regulation to the extent of that interest, although the property continues to belong to its private owner, and to be entitled to protection accordingly."

It appears to be a rule of general application that cooperatives serving only their own members are not public utilities. See Annotation in 132 A.L.R., at page 1498. But if they serve their members and others, or hold themselves out as willing to serve others, the majority rule appears to be that they are public utilities. Idem.

In *Garkane Power Co. v. Public Service Commission,* 98 Utah 466, 100 P.2d 571, 132 A.L.R. 1490, the same situation confronted the court as in our case — "the corporation [was] specifically prohibited from rendering service for or to the public"; it could only serve its members. In holding that the cooperative was not a public utility, the Supreme Court of Utah uttered these words:

"* * * So long as a cooperative serves only its own owner-members and so long as it has the right to select those who become members, ordinarily it matters not that 5 or 1000 people are members or that a few or all the people of a given area are accorded membership, provided the arrangement is a bona fide cooperative or private service organization and is not a device prepared and operated to evade or circumvent the law."

To like effect, see *Socorro Elec. Coop. Inc. v. Public Service Co.,* 66 N.M. 343, 348 P.2d 88.

To hold that a cooperative corporation, created to manufacture and sell at wholesale to thirteen incorporated cooperatives, who sell at retail, is a public utility by giving the statutory definition a strange and unconventional meaning leads to unconstitutionality. To place a corporation not purposing to serve the public indiscriminately in the status of a public utility means (1) that it must sell to all whom it physically can serve rather than retain its constitutional right of being at liberty to contract with whom it pleases, and (2) that, although its operation is limited, its property is by decree dedicated to a public use, a taking of property without due process.

Courts have sometimes used one or the other of these constitutional barriers to stay the hands of states which would make a business a public utility, when in fact it was not one. And sometimes they have used both grounds. There will be no attempt here to segregate them. Mr. Chief Justice Taft forewarns of constitutional impediments involved in an effort by the state to enlarge the scope of the "public interest" by legislation in the case of *Wolff Packing Co. v. Court of Industrial Relations, supra,* saying:

"If, as, in effect, contended by counsel for the state, the common callings are clothed with a public interest by a mere legislative declaration, which necessarily authorizes full and comprehensive regulation within legislative discretion, there must be a revolution in the relation of government to general business. This will be running the public-interest argument into the ground, to use a phrase of Mr. Justice Bradley when characterizing a similarly extreme contention. Civil Rights Cases, 109 U.S. 3, 24, 27 L. Ed. 835, 843, 3 Sup. Ct. Rep. 18. It will be impossible to reconcile such result with the freedom of contract and of labor secured by the 14th Amendment."

The Supreme Court of the United States, in addressing itself to the contention of the plaintiff in error in

the case of *Producers Transportation Co. v. Railroad Commission,* 251 U.S. 228, 40 S.Ct. 131, 64 L.Ed. 239, used language that is most apt:

"It is, of course, true that if the pipe line was constructed solely to carry oil for particular producers under strictly private contracts and never was devoted by its owner to public use, that is, to carrying for the public, *the State could not by mere legislative fiat or by any regulating order of a commission convert it into a public utility or make its owner a common carrier; for that would be taking private property for public use without just compensation, which no State can do consistently with the due process of law clause of the Fourteenth Amendment.*" (Emphasis supplied.)

The Supreme Court of the United States considered the status of a private carrier who was limited to transportation in interstate commerce under three contracts and had not undertaken to carry for the public nor to devote his property to any public use, *Michigan Public Utilities Commission v. Duke,* 266 U.S. 570, 45 S.Ct. 191, 69 L.Ed. 445, 36 A.L.R. 1105. The Court admonished that "it is beyond the power of the State by legislative fiat to convert property used exclusively in the business of a private carrier into a public utility, or to make the owner a public carrier, for that would be taking private property for public use without just compensation, which no State can do consistently with the due process of law clause of the Fourteenth Amendment. *Producers Transportation Co. v. Railroad Commission,* 251 U.S. 228, 230; *Wolff Co. v. Industrial Court,* 262 U.S. 522, 535. On the facts above referred to, it is clear that, if enforced against him, the act would deprive plaintiff of his property in violation of that clause of the Constitution."

In *Frost Trucking Co. v. Railroad Commission,* 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101, 47 A.L.R. 457, the Supreme Court of the United States considered a statute of the state of California, the Supreme Court of which had construed a provision of the state statute as requir-

ing a private contract carrier to obtain a certificate of public convenience and necessity before doing business over the state highways, as a condition obliging dedication of the carrier's property to the business of public transportation, thereby subjecting him to all the duties and burdens imposed by the act upon common carriers. The Court declared: "That, consistently with the due process clause of the Fourteenth Amendment, a private carrier cannot be converted against his will into a common carrier by mere legislative command, is a rule not open to doubt and is not brought into question here."

*Smith v. Cahoon,* 283 U.S. 553, 51 S.Ct. 582, 75 L.Ed. 1264, involved the constitutionality of the Florida statute covering carriers. Its constitutionality was challenged on the ground that it was repugnant to the due process and equal protection clauses of the 14th Amendment to the federal constitution. Relying upon the *Duke* and *Frost* cases, *supra,* the Court said that "such a scheme of regulation of the business of a private carrier, such as the appellant, is manifestly beyond the power of the State."

*Stephenson v. Binford,* 287 U.S. 251 53 S.Ct. 181, 77 L.Ed 288, 87 A.L.R. 721, confirms the view that the state cannot by legislative fiat convert property used exclusively in the business of a private carrier into a public utility or make the owner thereof a public utility, since that would be the taking of private property for public use without just compensation, in violation of the due process clause of the 14th Amendment.

There are many state decisions which have followed these federal cases. Only a few typical cases need be cited.

*Allen v. Railroad Commission, supra,* declares:

" 'Our Constitution and our statutory definitions above quoted therefore must be construed as applying only to such properties as have in fact been devoted to a public use, and not as an effort to impress with a public use properties which have not been devoted thereto. For

if the latter be the true construction of our Constitution and statutes, then manifestly in their operation they are void wherever they unjustly interfere with private property or private contractual rights by force of article 1, § 10, and of the Fourteenth Amendment of the Constitution of the United States. If the first alternative be selected, then, for reasons already given, such parts of these properties as are affected by the contracts with these petitioners have not been devoted to public use and their private contractual rights must prevail."

In the *Allen* case, the constitutional provision is quite like our constitutional provision, ordaining that "every class of private corporations, individuals or associations of individuals, hereafter declared by the legislature to be public utilities, shall likewise be subject to such control and regulation." The court in that case in effect requires the traditional meaning to be given to the term "public utilities."

*Dairymen's Coop. Sales Ass'n v. Public Service Commission,* 318 Pa. 381, 177 Atl. 770, 98 A.L.R. 218; *Hertz Drivurself Stations v. Siggins,* 359 Pa. 25, 58 A.2d 464; and *Inland Empire Rural E. v. Public Service Commission, supra,* are a few other instructive cases. In the last case a true cooperative, one serving only its members, was involved.

The *Allen* case, *supra,* is of utmost importance because of the constitutional authority in the legislature, as in ours, to define a public utility. It was held that this was not a carte blanche authority; that the definition would have to conform to the one traditionally used in order to avoid federal unconstitutionality.

The *Inland Empire* case, *supra,* is equally important, because it was a cooperative serving only its members, and the Supreme Court of Washington observed that any attempt to hold its operation to be a public utility would run afoul of the protections of the 14th Amendment to the United States Constitution.

The Enabling Act is the paramount law of this state

and all constitutional provisions of our fundamental state document must be consistent with it. In the event of a conflict the constitution must yield to the Enabling Act. The Enabling Act directed the Constitutional Convention of this state to form a constitution which would "not be repugnant to the constitution of the United States and the principles of the declaration of independence." Section 4. Both the Federal Constitution and the Declaration of Independence recognize the rights to life, liberty, and the pursuit of happiness. This word "liberty" has been construed to include freedom to contract and freedom to hold property under appropriate regulations where such are necessary.

An Enabling Act becomes "and is a fundamental and paramount law. It cannot be altered, changed, amended, or disregarded without an act of Congress." A state constitution "cannot be inconsistent with the Enabling Act." *Murphy v. State,* 65 Ariz. 338, 181 P.2d 336.

The term "liberty" appearing in the Declaration of Independence has the same meaning as it has in the federal and state constitutions. See *McKinster v. Sager,* 163 Ind. 671, 72 N.E. 854, 68 L.R.A. 273. Freedom to contract is embraced within the term "liberty" as used in these documents. 16 Am. Jur. 2d, pages 704-706, substantiates the assertion:

"Although the term 'freedom of contract' does not appear in the Constitution, the right to enter into a contract, with some exceptions, is a liberty which falls within the protection of the due process clause of the Fourteenth and Fifth Amendments to the Constitution of the United States. It is also safeguarded by the constitutions of the states, and, by a constitutional guaranty of pursuit of happiness. In general it may be said that the privilege of contracting is both a liberty and a property right."

It seems obvious to me that the selection of electrical cooperatives as being public utilities, subject to the restraints under which they operate, and leaving gas, tele-

phone, carrier, and other cooperatives outside the definition, constitutes a classification in violation of the equal protection provision of the 14th Amendment. In this respect I believe that the opinion of Mr. Chief Justice Harris of the Supreme Court of Arkansas, in the case of *Arkansas Commerce Commission v. Arkansas & Ozarks Railway Co.*, 235 Ark. 89, 357 S.W.2d 295, has some relevance. Attention is also called to the case of *Evansville & Ohio Valley Ry. Co. v. Southern Ind. Rural Electric Corp.*, 231 Ind. 648, 109 N.E.2d 901.

C.R.S. '53, 115-1-3, has been unjustifiably broadened by the majority to thereby make Colorado-Ute a public utility within the breadth of the statute's language. Cooperatives are of two kinds: those which serve only their members, and those which serve their members and the public. See 132 A.L.R. 1490, and annotation. The statute is so drafted that it covers both, and in each instance the members or public are consumers of the electrical energy. To bring a cooperative which shall manufacture and sell at wholesale for a few cooperatives (retailers) within the purport of the statute is an unwarranted extension of the statute, and for reasons already stated, violative of the federal constitution.

The enigmatic status of Colorado-Ute pervades the record of this case. An additional oral argument was ordered by this court, in which the parties were directed to answer certain questions propounded by the court relating to its status as a public utility. Public Service and Western relied upon the statute, while Colorado-Ute's position was one difficult to assess. However, the latter confessed that it had problems in reconciling Colorado-Ute's limited operation with that which is ordinarily believed to be the sphere of action of a public utility.

Commissioner Horton stated "that there is a very serious doubt in the mind of the Commission that the legislative intent was to require Ute to obtain a certificate

of public convenience and necessity to construct a plant at Hayden to serve its members."

In its opening brief (page 108) Colorado-Ute points to C.R.S. '53, 115-1-3, for an answer to the following comment and question:

"Accordingly, it is perfectly clear from the record that Colorado-Ute is a wholesaler of electric energy to its members only, and the areas in Colorado served by these members is clearly shown on Exhibit 9 . . . Does such a status make it a public utility?"

Since cooperatives, such as those involved in this case, have an impact upon public utilities supplying electrical energy, it is right and proper that they be regulated, not as public utilities, but as business impressed with the public interest. What governmental agency is better situated to perform this function than the Public Utilities Commission?

I would sustain the Commission upon the basis that its action was regulatory under the statute, and that any part of its decision in excess of regulation is without force and effect.

MR. JUSTICE MOORE:

On Petition for Rehearing.

ADDENDUM

The petition for rehearing filed on behalf of Colorado-Ute contains five separately numbered points which counsel asserts this court overlooked or misapprehended. We consider them in some detail in the following point by point reference.

Point I. It is argued that our decision (a) denies Colorado-Ute the authority to serve its members and gives protestants the exclusive right to do so; (b) requires Colorado-Ute to sustain a higher degree of proof of public convenience and necessity than that required of other utilities by requiring it to show inadequacy of service by a nonpublic utility; and (c) denies Colorado-

Ute the same opportunities afforded other public utilities to construct facilities to serve existing members, in violation of the due process and just compensation clauses of the Fifth Amendment to the United States Constitution.

None of these assertions are true. (A) Our decision does not deny Colorado-Ute authority to furnish electric energy to the members it had acquired when the application was made for a certificate; it does, however, deny it permission to expand its facilities and spread its service areas to a point where it would encompass those already being adequately served by other certificated suppliers of electrical energy. Our decision does not give the protestants the exclusive right and privilege of rendering such service, but it does protect all public utilities against competition by new public utilities without adequate proof and findings that public convenience and necessity requires the new facility or expanded new service. The decision violates no constitutional right of Colorado-Ute, because its service is affected with a wide public interest and it must therefore conform to the Public Utilities Law of the State of Colorado, and the well established doctrine of regulated monopoly which is an important part of that law.

(B) The decision does not require a higher degree of proof by Colorado-Ute; it does, however, hold that no proper proof of public convenience and necessity was shown as a matter of law by the record, particularly when the unanimous conclusion of all members of the Utilities Commission was that adequate sources of power already existed to supply the needs of the *proposed new members* of Colorado-Ute. Our decision points out (at pages 10 and 11 thereof) that the Commission considered all existing sources (not just those available from the Bureau of Reclamation) and found them to be adequate. The requirement of the Public Utilities Law is to protect the public from supporting increased investment (in this case in excess of 30 million dollars)

without regard to whether that investment would duplicate the facilities of a regulated or a nonregulated supplier. The adverse economic impact upon the public is the same whether the existing source of supply is a federal agency (and therefore unregulated by state authority) *or* a public utility subject to regulation by the Commission. We refer back to page 21 of our opinion in this connection where pertinent legal conclusions are drawn.

(C) Our decision does not deny Colorado-Ute "the same opportunities afforded to other public utilities to construct facilities to serve existing members." The "existing members" referred to in the petition for rehearing are the *proposed new members* for whom it would be necessary that Colorado-Ute expand its service area to a large portion of the State of Colorado, and have additional electrical energy at its disposal. Colorado-Ute has not been denied the right to serve its original members. Its desire to construct *new facilities* and to serve *new members* was the very issue requiring proof of public convenience and necessity which it failed to sustain because of the Commission's conclusion that existing sources of energy were adequate. Colorado-Ute cannot by-pass this burden of proof merely by entering into contracts with potential new members or customers who are not suffering from lack of electrical service by existing suppliers.

Point II. In this assignment of error it is asserted that this court misconstrued C.R.S. 1963, 115-5-1. This, too, we believe is not true. This section, in addition to prohibiting a public utility from interfering with any other such utility, provides that no new plant or system can be constructed without proof of public convenience and necessity, subject to certain exceptions (none of which were found to be applicable in this case). The fact that the Bureau of Reclamation is not a public utility again does not absolve Colorado-Ute from proving public convenience and necessity, and neither does

it detract from the law that duplicating facilities requiring enormous investments should not be supported by the consuming public if they are unnecessary. The record discloses that it was Colorado-Ute who initiated all testimony with respect to the availability or lack of availability of Bureau power, and it is too late for it to now contend that this evidence should not be considered in determining public convenience and necessity.

Point III. It is here asserted that the court "misapprehended" the constitutionality of C.R.S. 1963, 115-1-3(2) (the legislative declaration that co-operatives are public utilities) in that it violates due process, infringes upon private rights of contract, and violates equal protection of the law in violation of pertinent provisions of the Constitution of the United States.

Under this assignment of error Colorado-Ute completely reverses the position it unequivocally took before the Commission and throughout the entire proceeding, and apparently places reliance at this late date upon the content of the views of one dissenting justice. It now takes the position that it is not a public utility. Reference is made to that portion of the opinion in which we discuss in detail the fact that the business of Colorado-Ute is affected with a public interest and is properly classified by the legislature as a public utility. This allegation contained in the petition for rehearing is the first formal pleading ever filed in this case by Colorado-Ute in which it is claimed that it is not a public utility subject to the jurisdiction and regulation of the Public Utilities Commission. Its position before that body was exactly the opposite. Mr. Moses, representing Colorado-Ute, made the following statement during a forensic colloquy relating to the question as to whether his client was a public utility. It appeared that in a document filed with the Commission it was asserted that Colorado-Ute, "* * * is or may be a public utility."

"MR. BARRY: No, sir.

"COMMISSIONER HORTON: I have no further questions then.

"MR. MOSES: I might say for the record and in explanation of this, that this application was copied from our last securities application which was filed when counsel had some question in counsel's mind. Counsel doesn't have any question any more.

"MR. BARRY: I am sorry, Mr. Moses, I was talking with Mr. Baucom. What did you say?

"MR. MOSES: I said in essence that this was my error, and that it was copied from our previous securities application which was filed at a time when there was a question in my mind as to whether they were a utility or not. There is no question in my mind anymore.

"MR. BARRY: Maybe we can clear up the record, and I think it would be better. Would you like to amend your application to delete the words 'may be'?

"MR. MOSES: I would be perfectly happy to delete the words 'may be' to make it consistent, because I think we are a utility.

"COMMISSIONER ZARLENGO: Have the record show that the petition No. 19156 dealing with securities is amended by dropping the words in paragraph one, 'or may be.'

"MR. MOSES: Thank you."

Points IV and V. It is claimed in both of these assignments of error that this court made findings of fact — paragraph four alleging this to be unconstitutional, and paragraph five asserting that this court violated the statute which requires affirmance by the reviewing court of a finding which has sufficient support in the evidence. The finding of fact alleged to have been made by the court is that existing power sources were adequate. Clearly, this was not a finding of fact by this court. That finding was made by the Commission and is abundantly supported by the evidence. The opinion of this court contains references to the decision of the Commission where all three Commissioners found an adequacy

of existing sources. Had this court made a finding to the contrary we would then have been in a position of having unwarrantedly substituted our judgment for that of the Commission, in which case those adversely affected would have ground for complaint.

It is alleged in paragraph five that the Public Utilities Commission expressly found that existing power supplies were not adequate and references to the record are given. This allegation in specious. The Commission did not so find; on the contrary, it found existing sources adequate, and also, that there were in fact alternative sources of power available to Colorado-Ute's proposed new members including that available by certificated public utilities authorized to serve in the area. The reference to C.R. p. 5144 (being a portion of the Commission's decision) not only fails to sustain Colorado-Ute's contention, but actually refers to a finding of the Commission that existing sources were adequate. Other references to the record before the Public Utilities Commission point to portions thereof where Colorado-Ute attempted to prove Bureau power inadequate; this was expressly rejected by all three members of the Commission. Such references to the record are merely a rehash of disputed testimony which was not accepted by the Commission. The references to C.R. p. 1682 and p. 1915 do not support the assertion that existing power sources are inadequate; actually, the Commission found to the contrary of this assertion as shown at pages 11 and 12 of the court's decision.

The petition for rehearing filed by the Public Utilities Commission is substantially similar to the petition filed by Colorado-Ute. Therefore, since no new or other issues were raised by the Commission's petition, the discussion relating to the Colorado-Ute petition for rehearing is equally applicable to the Commission's petition.

The foregoing discussion, while perhaps unnecessary, is presented in the hope that it may add clarity to the opinion and demonstrate that the points urged in the

petition for rehearing were not overlooked or misapprehended by this court.

The petition for rehearing is denied.

MR. JUSTICE FRANTZ, for reasons stated in his dissent, would grant the petition for rehearing.