No. 18,165.

PUBLIC UTILITIES COMMISSION OF THE STATE OF
COLORADO, ET AL. *v.* JAMES F. DONAHUE, DOING
BUSINESS AS AIRLINES CAB SERVICE.
(335 P. [2d] 285)

Decided February 9, 1959.   Rehearing denied March 2, 1959.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. HENRY E. ZARLENGO, Assistant, for plaintiff in error Public Utilities Commission of Colorado.

Messrs. MURRAY, BAKER & WENDELKEN, for plaintiff in error Pikes Peak Automobile Company.

Mr. ALVIN J. MEIKLEJOHN, JR., for defendant in error.

*En Banc.*

MR. JUSTICE HALL delivered the opinion of the Court.

IN this opinion we will refer to the Pikes Peak Automobile Company as the applicant, to James F. Donahue, doing business as Airlines Cab Service, as protestant, to the Public Utilities Commission of the State of Colorado as the PUC, and the Colorado Springs Municipal Airport as the airport.

From the record before us it appears that since about 1934 the protestant has been furnishing scheduled passenger service between Colorado Springs and its airport and that since July 28, 1939, he has been the owner of Certificate of Public Convenience No. 1305, issued by the PUC pursuant to its Decision No. 13821. This certificate authorized and called for a *for-hire scheduled motor vehicle passenger service* between the Colorado Springs Municipal Airport, located about eight miles east of Colorado Springs, and the city of Colorado Springs and surrounding territory within a radius of seventy-five miles of Colorado Springs. The service consisted of meeting all scheduled flights of Braniff and Continental Airlines stopping at the airport and meeting unscheduled flights and private planes on call and demand. Protestant, in presenting its evidence before the PUC, requested the hearing commissioner to take official notice of the contents of Certificate No. 1305, an annual report of protestant, and its equipment list. The request was granted, but unfortunately we do not have these documents before us. Likewise, there is no ·evidence in the record as to protestant's tariffs other than the unchallenged statement of counsel for applicant that:

"We have the same identical schedule that is in effect by the old cab line, the Air Cab Service, which is a minimum of $1.35 and $1.00 per passenger to the City of Colorado Springs."

The evidence is uncontradicted that from the date it

received Certificate No. 1305 until March 1, 1956, protestant, and none other, furnished scheduled service between the airport and Colorado Springs and surrounding points.

During most of the time this scheduled service was furnished by protestant and up to March 1, 1956, applicant and its predecessors in title operated a so-called "Livery Service" pursuant to authority granted by Certificate of Public Convenience and Necessity No. 116 (issued pursuant to Decision No. 1165 and as modified by decisions numbered 15523, 16561, 17012 and 32399), to transport passengers for hire by auto livery service between all points in the state of Colorado. The above numbered modifications were of minor importance and do not affect or control any of the issues before us; however, they do contain language which is highly significant and to which we refer.

Decision No. 15523 of date June 13, 1940, granted to the applicant and twenty-two others authority to operate auto livery services between all points in the Pikes Peak Sightseeing Region and from and to said points to and from other points in the state of Colorado, subject to the following restrictions:

(a) Cars used to be of type now used in sightseeing business — each operator shall be limited to the number of cars he is now entitled to use under his sightseeing certificate, only 5 passengers to a car in all trips of 10 one-way miles or under;

(b) Rates on all trips to be based upon round trip mileage plus waiting time;

(c) Service not to be advertised outside of El Paso County.

From the record it appears that numerous other persons have authority for *auto livery service* and subject to the same or similar restrictions imposed on applicant.

Prior to March 1, 1956, applicant and others holding auto livery service certificates *on call* made trips between the airport and Colorado Springs and surrounding

area, all in conformity with their respective *restrictive permits.*

In November of 1955, the city of Colorado Springs advertised for bids for:

"The Privilege of Furnishing Limousine Service Between Petersen Field [the airport] and the City of Colorado Springs and Vicinity."

In instructions to bidders it stated that the service to be rendered was *scheduled* limousine service to accommodate all passengers of scheduled flights. Airlines could demand and the successful bidder would be required to furnish additional service for unscheduled flights. The City also proposed to grant to the successful bidder preferential parking rights at the airport and the exclusive right to solicit business in the terminal facilities. The rates to be charged were to be in accordance with rates filed with and approved by the PUC.

Before submitting its bid, applicant, proceeding under its Certificate No. 116, as amended, modified and restricted, on December 3, 1955, filed with the PUC reduced tariffs for service between Colorado Springs and the airport, and on December 5, 1955, by Authority No. 13988 the PUC granted applicant authority to publish new rates — the same as those of protestant — and to put them into effect: "upon * * * posting at offices of said company copies thereof at least one day in advance of the effective date."

Applicant and protestant bid for the *Privilege* offered by Colorado Springs. Applicant's bid, being the higher, was accepted.

On January 31, 1956, the applicant, its authority to render the proposed service being questioned, filed its application with the PUC, setting forth many of the facts outlined above, and requested the PUC to grant to it the following relief:

(1) To interpret applicant's existing authority as authorizing it to transport passengers to and from the Colorado Springs Airport from and to all points in Colo-

rado at rates authorized December 5, 1955, and free from limitations as to number of passengers per car, or .

(2) In the alternative for an order relieving applicant of all restrictions imposed with reference to its operations to and from the airport, or

(3) In the alternative, that applicant be granted a certificate of public convenience and necessity to transport passengers for hire to the airport from all points in the State of Colorado and from all points in the State of Colorado to the airport *in* such type of motor vehicles as the needs of the public may reasonably require.

On February 29, 1956, applicant entered into a contract with Colorado Springs, which contract embodied the terms set forth in the request for bids. On March 1, 1956, applicant initiated scheduled service to and from the airport at the tariffs approved December 5, 1955, and with equipment described as eight passenger, deluxe model, Volkswagens.

Hearing on its January 31st application was set for April 12, 1956, and notice served on twenty carriers or their agents, presumably all of the carriers that might be interested in or affected by action on the application. Only the protestant filed written objections and actively appeared in opposition. Hearing was completed April 12, 1956, briefs filed, and on June 22, 1956, the PUC made extensive findings and entered its Decision No. 46050 denying requests numbered 1 and 3, and granting request No. 2 in the following words:

"THE COMMISSION ORDERS:

"That public convenience and necessity requires, and will require, that The Pikes Peak Automobile Company, a corporation, applicant herein, in its passenger operations to and from the Colorado Springs Airport, Colorado Springs, Colorado, from and to other points in the State of Colorado, be, and is hereby, exempted from the restrictions and limitations contained in Decisions Nos. 15523, 17012 and 32399 of this Commission, and *this Order shall be taken, deemed and considered as a cer-*

*tificate of public convenience and necessity to conduct the operation referred to, without being bound by such restrictions and limitations."* (Emphasis supplied.)

Protestant's petition for rehearing was filed and denied on July 18, 1956, whereupon he filed his petition for writ of review or certiorari in the Denver District Court.

On December 11, 1956, the district court entered its findings and order holding the actions of the PUC to be unlawful, arbitrary and in excess of its authority, and entered judgment setting aside and holding for naught said Decision No. 46050, dispensing with a motion for a new trial and refused a stay of execution.

Applicant is here by writ of error, seeking reversal of the judgment of the district court and reinstatement of the decision of the PUC.

In seeking to resolve this matter, we must bear in mind that the PUC has wide discretionary powers in determining the demands of "public convenience and necessity." We must also bear in mind that a person serving the public under a certificate of public convenience and necessity is a part of the public, and public convenience and necessity requires that he be treated fairly and that no new or extended operations be authorized which endanger or impair the operations of existing carriers contrary to the public interest.

Looking at substance rather than form, we find that prior to 1956, protestant had a certificate of public convenience and necessity which granted to him the exclusive right to furnish scheduled service to and from the airport; by the same token he was obligated to furnish this service at rates approved by the PUC. During this same period the applicant and at least twenty other carriers had certificates of public convenience and necessity which authorized them to render unscheduled service, a call and demand service, to and from the Pikes Peak Sightseeing area to all points in Colorado, including the airport. Applicant (and others) holding similar certifi-

cates had no right or duty to furnish scheduled service to the airport or elsewhere; had no authority to establish rates except on a round-trip basis; had no right to haul more than five passengers in a car (later modified to six); had no right to advertise its service outside of El Paso County. The above restrictive conditions, integral parts of the certificates of public convenience and necessity, were imposed to prevent the holders thereof from competing with and rendering the scheduled operation of protestant inefficient, if not impossible.

The restrictions in applicant's certificates were not designed to procure high quality service at reasonable rates to and from the airport; quite the contrary, they were designed to make applicant's business noncompetitive with that of protestant and with good reason therefor. The amount of air passenger business is limited, and to have permitted twenty other carriers to compete with protestant by a call and demand service, would be to make a scheduled service financially impossible and seriously impair service to the public.

In Decision No. 15523, one of the sources of applicant's (and twenty-two others) authority, the commission uses the following language:

" * * * some of the attorneys * * * agreed that certificates might be granted to applicants * * * if *upon a non-competitive rate with scheduled service and a charge based on a round trip, only.*

\* \* \*

"In our opinion, a rate of * * * will result in reasonable rates to the public and at the same time *give proper protection to scheduled operations.*

\* \* \*

"We are further of the opinion, and so find, that such 'auto livery service' [applicant's and twenty-two others' service] may be furnished only by passenger cars of the type used by applicants in their sightseeing business, and should be limited to the same number of cars that applicants are authorized to use under their certificates

covering sightseeing operations, no additional cars being permitted for such 'auto livery service,' * * *." (Emphasis supplied.)

In Decision No. 17012, another source of applicant's (and thirty others) authority, we find the following language:

"(d) It is further provided that all the rates above prescribed are *minimum rates* for both over and under ten one-way miles and shall be based upon round-trip mileage.

\* \* \*

"IT IS FURTHER ORDERED, That on any transportation that is *competitive with scheduled motor vehicle* carriers, the base fare of the [unscheduled] motor vehicle *shall be increased by an amount equal to twenty per cent. of the scheduled carriers' round-trip fare currently in effect."* (Emphasis supplied.)

The above language shows clearly that the commission was seeking to protect the scheduled operator (protestant) from competition by applicant and twenty or thirty other non-scheduled sightseeing operators; it sought by limiting the equipment to be used by these operators to prevent the strong from gobbling up the weak. The interests of the traveling public, usually paramount, were relegated to a status of secondary importance when *minimum,* rather than maximum, rates were fixed and the number of vehicles to be used to serve the public was limited to the number then in use, rather than to the number necessary to meet the reasonable requirements of the public.

On March 1, 1956, the applicant commenced scheduled service, at the same rates as protestant, with unlimited equipment, and fortified with a contract of the city of Colorado Springs, whereby it is granted:

(1) preferred parking space for loading and discharging of passengers;

(2) assurance that no competitor (protestant) shall have desk space in the terminal building;

(3) guarantee that no one (protestant) shall solicit transportation within the terminal building.

To say, as applicant contends, that this is the operation provided for by the above mentioned certificates and decisions (the sources of applicant's authority) is to shut one's eyes to reality and to look at form rather than substance.

Just how did applicant change its operations from a noncompetitive sightseeing operation to a highly competitive and destructive scheduled operation? The first step was taken in its application filed with PUC December 3, 1955, wherein it asked permission to publish and file reduced rates for service between the airport and Colorado Springs, Broadmoor and Manitou, the reduced rates to be the same as those of protestant's scheduled service, to be effective on one day's notice. The PUC granted the permission requested. Publishing and filing said rates constituted a clear violation of applicant's then authority, whereby applicant's operations were conditioned on charging rates based entirely on round trips.

How did applicant change the nature of its service from call and demand round trip to a scheduled service? By contract with the city of Colorado Springs, which contract did not have and does not have the approval or expressed sanction of the PUC.

The PUC in its findings states:

" * * * Applicant is required to provide for the accommodation of passengers of all incoming and outgoing commercial air line flights, no matter what the size of the group may be, and regardless of the fact that notice has or has not been received from passengers of any flight requesting the service. In emergencies such as the arrival of nonscheduled flights, additional service must be furnished. * * *."

Failure to furnish this service would constitute a violation of applicant's contract with the city; it would not constitute failure to comply with the terms of its PUC

certificates, for such do not authorize, much less require, rendition of any scheduled service.

Thus we see that the applicant, by ex parte filing of new tariffs in direct conflict with the terms of its PUC authority, and by entering into a contract with the city, has achieved all benefits that could flow from a certificate of public convenience and necessity for scheduled service and without a corresponding obligation to render adequate service to the public.

If the decision of the PUC were permitted to stand, it would result in applicant retaining its authority, enjoyed and used prior to March 1, 1956, to render a call and demand service to the airport on round trip rates not to exceed six passengers to a car, and in addition the authority, not previously enjoyed or used, to render a scheduled service to and from the airport at new rates, including one-way fares. Clearly this would be a new additional authority bearing only slight resemblance to the original authority.

Applicant urges that removal of the restrictions is authorized by C.R.S. '53, 115-6-12:

"The commission, at any time upon notice to the public utility affected, and after opportunity to be heard as provided in the case of complaints, may rescind, alter or amend any order or decision made by it. Any order rescinding, altering, or amending a prior order or decision, when served upon the public utility affected, shall have the same effect as original orders and decisions."

The right to amend does not authorize an amendment which provides for an entirely new service which the certificate to be amended expressly precludes. Authorization to engage in an entirely new service, a service which the applicant is forbidden to enter, can be granted only pursuant to C.R.S. '53, 115-9-5:

"The commission shall have power, under such rules of procedure governing the application therefor as it may prescribe, to issue a certificate of public convenience and necessity to a motor vehicle carrier or to issue it for the

partial exercise only of the privilege sought; and may attach to the exercise of the rights granted by said certificate such terms and conditions as, in its judgment, the public convenience and necessity may require."

The PUC denied the request for a certificate granting a new authority and yet by lifting the restrictions, it did by indirection grant authority which it held could not be granted directly. In this it was in error, and the judgment of the district court so holding is correct.

Applicant, having obtained from the PUC its order removing restrictions from its certificates, apparently was satisfied with the order, and did not petition for review of that part of the order denying it a certificate of public convenience and necessity, as requested in paragraph 3 of its prayer for relief; consequently we are not called upon to pass upon the correctness of that ruling. However, in view of the fact that we feel the grounds assigned by the PUC for its refusal to grant such a certificate are clearly erroneous, we point out that in its order of denial the PUC said:

" * * * Rule 12 (d) of the Rules of Practice and Procedure before the Commission, 1955, reads as follows:

" 'Proof Necessary for Certificate of Public Convenience and Necessity. Applicants for authority to operate as a Common Carrier *must prove* by witnesses (including shippers or passengers), sworn and examined at the hearing *that public convenience and necessity requires such operation,* and make such other proof as is required. *The responsibility of making the proof required by law is on the applicant.'*

"No passenger witnesses were sworn and examined at the hearing, and this fact, coupled with failure to prove need for state-wide service to and from the Airport, must result in the denial of the application for new authority."

Apparently the PUC took the position that the above rule precludes issuance of a certificate unless there is before it testimony of *passenger witnesses.*

■ We do not agree with such interpretation of the

rule and are of the opinion that the rule means (and says) that there must be sworn testimony, and that testimony *may include* the sworn testimony of shippers and passengers. If the rule means that no application can be granted without passenger testimony, no matter how strong other proof might be, then such rule would defeat the purpose of the trial and constitute a denial of due process.

"The object for which evidence is offered in the trial of a cause is to ascertain the truth concerning the facts in issue, and the fundamental basis upon which all rules which govern its admission or exclusion must rest, if they are to rest upon reason, is their adaptation to the development of the truth of such facts." — 20 Am. Jur. 34, §3.

Not even the legislature, and a fortiori, the PUC, has authority to inhibit a fact-finding body from considering any admissible evidence having probative value.

"It [the legislature] must, however, in prescribing the rules of evidence, in either civil or criminal cases, afford each party a fair opportunity to present his case and to submit all the facts pertinent thereto. The legislature is not permitted, under the pretense of regulating evidence, to establish rules of evidence which prevent a party from exhibiting his rights or deny him the opportunity of a fair trial by virtually excluding evidence in his behalf; to do so would substantially deprive him of due process of law." — 20 Am. Jur. 38, §8.

The second reason assigned for denial of a certificate is:

" * * * this fact, coupled with failure to prove need for state-wide service to and from the Airport, must result in the denial of the application for new authority."

There might well be proof of need for service to and from the airport and Colorado Springs and its suburbs and no proof of need for state-wide service. Lack of proof for need of state-wide service cannot serve as a

valid reason for denial of service to the extent and in the area needed.

Nothing herein stated shall be considered as precluding issuance to applicant, or any other applicant, of a certificate of public convenience and necessity to serve the needs of the public traveling to and from the Colorado Springs Airport upon proper application, notice and proof.

The judgment is affirmed.

MR. JUSTICE DAY does not participate.