NEWS & FILM SERVICE, INC., a Colorado corporation, Petitioner–Appellee,

v.

The PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO, Respondent–Appellant,

and

Northwest Transport Service, Inc., a Colorado corporation, Respondent–Appellee.

No. 88SA387.

Supreme Court of Colorado, En Banc.

Feb. 20, 1990.

Kimball & Nespor, P.C., Charles J. Kimball and Julieann Kimball Nespor, Denver, for petitioner-appellee.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., and Mark W. Gerganoff, Asst. Atty. Gen., Denver, for respondent-appellant.

No appearance for respondent-appellee.

Chief Justice QUINN delivered the Opinion of the Court.

The Public Utilities Commission (PUC) appeals from a district court judgment setting aside a PUC decision to revoke certificates of public convenience and necessity and contract carrier permits previously issued to News and Film Service, Inc. (NFS).[1] The district court held that the PUC's decision was unjust and unreasonable. We reverse the judgment of the district court and remand the case to that court with directions to reinstate the PUC decision.

NFS is a Colorado corporation which held certificates of public convenience and necessity for the transportation of various forms of printed material (newspapers, books, magazines, and data processing reports, as well as motion pictures, television

---

1. An appeal from the a decision of the district court affirming, setting aside, or modifying a decision of the PUC must be filed in the supreme court. § 40–6–115(5), 17 C.R.S. (1988).

films, and photo supplies) along certain restricted routes. The certificates also authorized NFS to transport "on call and demand" automotive parts *from* Denver to all points in the state of Colorado. In addition, NFS held contract carrier permits authorizing it to contract for hire with respect to the shipment of newspapers, including the Rocky Mountain News and the Denver Post, along certain restricted routes within the state. These permits also authorized NFS to transport film, baked goods, orange juice, and certain drug supplies for named customers only.

On December 3, 1985, the PUC informed NFS by letter that a staff investigation of NFS's operations disclosed that NFS might be operating in violation of PUC rules and regulations as well as a 1984 PUC order which approved a stipulated agreement between NFS and the PUC staff. In the 1984 stipulated agreement, NFS, in response to a show cause order, conceded that it had violated PUC regulations by improperly transporting automotive parts between various points in the state and agreed to suffer the revocation of its authority to ship automotive parts, subject to a stay of execution for two years on the condition that NFS not engage in any further violations during the two-year period.

The PUC letter of December 3, 1985, contained a proposed show cause order detailing numerous alleged violations during the period between June 3 and October 1, 1985. These violations consisted of NFS's transportation of automotive parts from points outside Denver to various locations in the state in violation of the earlier 1984 PUC order and also NFS's transportation of other items under the name of Columbine News Service in violation of PUC rules.[2]

NFS responded to the letter, but the PUC was not satisfied with the response and issued a notice of an evidentiary hearing on the alleged violations. Other motor carriers, which claimed that NFS's unauthorized operations were depriving them of revenues, were permitted to intervene in the proceeding.[3]

Prior to the evidentiary hearing, the PUC staff and NFS executed a written settlement agreement in which NFS acknowledged that it had transported items beyond the scope of its authority and had received approximately $12,654 as a result of such unauthorized shipments. In this agreement, NFS consented to the following provisions applicable to its operating authority: NFS agreed to the immediate revocation of its authority to transport on call or demand new and used automotive parts from Denver to all points within the state; NFS also agreed to the immediate restriction of its authority to transport new and used automotive parts; NFS agreed to cease transporting any item in violation of the rules and regulations of the PUC; NFS agreed to cease all intrastate transport operations under the name of Columbine News Service; NFS agreed to pay $12,654, which it received as a result of its unautho-

---

**2.** Specifically, the PUC alleged that NFS was in violation of Rule 3(a) of the PUC Rules Governing Common Carriers by Motor Vehicle, 4 CCR 723-8, at 1 (1977), which states as follows:

No common carrier shall extend, or in any manner enlarge, diminish, change, alter, or vary the route or routes, or the service authorized by its certificate, or serve any point or intermediate point or transport any commodities not included therein, unless and until such common carrier has made application to the commission and the commission has authorized the same.

The PUC also alleged a violation of Rule 5 of the PUC Rules Governing Contract Carriers by Motor Vehicle, 4 CCR 723-23, at 9-10 (1986), which states:

After a hearing upon at least ten days notice to the contract carrier affected, a permit may

be revoked, suspended, altered, or amended by the commission for any of the following reasons:
1. Violation of or failure to comply with any statutory enactments concerning contract carriers by motor vehicle.
2. Violation of or failure to comply with the terms and conditions of the permit.
3. Exceeding the authority granted in its permit.
4. Violation of or failure to observe and comply with any order, rule, or regulation of the commission.

**3.** Northwest Transportation Service, Inc., Northeastern Motor Freight, Inc., and West Way Motor Freight, Inc., were permitted to intervene in the PUC proceeding, but none of these carriers have entered an appearance in this court.

rized operations, to the State Motor Carrier Fund; and NFS agreed to submit to a revocation of all its remaining authority, which revocation would be stayed for three years on the condition that no further violations occur during that period. None of the intervening common carriers opposed the terms of the settlement.

The stipulated settlement agreement was submitted to a hearing examiner for approval pursuant to Rule 83 of the PUC Rules of Practice and Procedure.[4] The hearing examiner rejected the agreement, ruling that NFS's voluntary payment of $12,654 to the State Motor Carrier Fund was the equivalent of a monetary fine and, as such, was beyond the PUC's authority[5] and that other sanctions within the authority of the PUC would be more appropriate. NFS and the PUC staff filed a motion for reconsideration. In ruling on the motion, the hearing examiner noted that NFS had admitted in the stipulated settlement agreement to its transportation of items in violation of PUC rules and regulations and accordingly recommended the revocation of NFS's certificates and contract carrier permits.

The PUC staff filed exceptions to the hearing examiner's recommended decision, arguing that the hearing examiner erred in recommending revocation of NFS's certificates and permits and in determining that NFS's contribution of $12,654 to the State Motor Carrier Fund would constitute an unlawful monetary fine. NFS filed similar exceptions and additionally claimed that the revocation of its certificates and permits would destroy its business. The PUC approved that part of the recommended decision characterizing NFS's payment of $12,654 to the State Motor Carrier Fund as an unlawful monetary fine, but ruled that the hearing officer erred in recommending the revocation of NFS's certificates and permits, since such sanction was not part of the settlement agreement, and further ruled that NFS was entitled to a hearing on the alleged violations.[6]

A hearing on NFS's alleged violations was conducted by a hearing examiner on March 31, 1987. The two witnesses testifying at the hearing were West Twomey, a transportation representative for the PUC, and James Wright, president of NFS. Twomey's testimony, as well as exhibits admitted into evidence, established that during the period from June 3 to October 1, 1985, NFS had transported items within the state in violation of PUC rules on 264 occasions and that NFS also had transported 179 items under the name of Columbine News Service in violation of the PUC rules. Wright admitted that NFS had transported automotive parts within the state, but stated that he thought such operations were within NFS's authority. He further testified that NFS, after learning that NFS would be acting outside the scope of its authority if it were to continue to transport certain automotive parts, filed an application to modify its certificate but the application was denied. Wright admitted that NFS, notwithstanding the denial of the application, continued to transport automotive parts in order to give its customers time to make alternative transportation arrangements.

---

4. Rule 83 of the PUC Rules of Practice and Procedure, 4 CCR 723–1, at 215 (1987), requires the PUC to approve or disapprove any written stipulation. Subsection (a) of the rule states:

   Any two or more parties may offer into evidence as an exhibit, a written stipulation as to any fact or matter in issue of substance or procedure. The Commission shall enter an order approving or disapproving any stipulation offered into evidence as an exhibit, or may recommend modification as a condition for approval.

5. Once the hearing examiner determined that the portion of the stipulated settlement agreement requiring NFS to pay $12,654 to the State Motor Carrier Fund constituted a monetary fine, the hearing officer was obliged to also rule that such a penalty was beyond the authority of the PUC on the basis of our decision in *Haney v. Public Utilities Comm'n.*, 194 Colo. 481, 574 P.2d 863 (1978). That case held that the PUC is without statutory or constitutional authority to impose a monetary fine as an alternative to revoking or suspending a contract carrier's certificate or permit for violation of the Public Utilities Law or the rules of the PUC.

6. After the PUC's decision, NFS and the PUC staff submitted a revised settlement agreement, but such agreement was rejected by the hearing examiner.

In a decision issued on July 7, 1987, the hearing examiner ruled that, based on the evidence presented during the hearing as well as NFS's admissions in the stipulated settlement agreement, NFS "repeatedly and intentionally" violated PUC rules and regulations by transporting commodities to and from areas within the state in excess of its authority and by providing transportation services beyond its authority. The hearing examiner also ruled that NFS's stipulated agreement to pay $12,654 to the State Motor Carrier Fund constituted an invalid fine. Concluding that NFS was "unfit to continue as a public utility," the hearing examiner recommended that the PUC revoke NFS's certificates of public convenience and necessity and contract carrier permits.

NFS and the PUC staff filed exceptions to the recommended decision, claiming that the hearing examiner erred in finding that NFS had transported items and engaged in operations beyond the scope of its authority, in rejecting the stipulated settlement, and in concluding that NFS had repeatedly and intentionally violated PUC rules and regulations. The PUC, on November 25, 1987, ruled that the hearing examiner erred in utilizing NFS's admissions in the stipulated settlement agreement as a basis for finding that NFS had violated PUC rules and regulations and accordingly struck that portion of the recommended decision. However, the PUC approved the recommended decision in all other respects, including the hearing examiner's finding that NFS had transported commodities between points in Colorado in violation of PUC rules and regulations, and in a 2–1 decision entered an order revoking NFS's operating authority.

After its application for reconsideration was denied, NFS filed an application for a writ of certiorari in the district court, claiming that the PUC acted in excess of its authority and that the PUC decision was not in accord with the evidence and was unjust and unreasonable. On October 5, 1988, the district court entered a written ruling setting aside the PUC's order of revocation. Although acknowledging that it could not substitute its judgment for that of the PUC and that there was sufficient evidence that NFS violated PUC rules and regulations, the court nonetheless concluded that the PUC's decision to revoke all of NFS's transportation authority was "unjust and unreasonable." In so ruling, the court emphasized the following factors: that the stipulated settlement had been recommended by the PUC staff and had been approved by NFS, the PUC staff, and the intervening carriers; that one of the commissioners had voted to accept the stipulation; that the order of revocation probably would result in NFS going out of business; and that the stipulated settlement agreement provided for the revocation of a part of NFS's authority to do business and provided adequate protection for the public as well as for NFS's compliance with PUC regulations.

In appealing the judgment, the PUC claims that the district court applied an incorrect standard of judicial review in setting aside the PUC's decision and, in effect, substituted its judgment for that of the PUC. We agree with the PUC's claim.

The Public Utilities Law limits the scope of judicial review of a PUC decision to three general categories. Section 40–6–115(3), 17 C.R.S. (1984), states in this respect as follows:

> [T]he review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence.

Because section 40–6–115(3) is general in its terms, we have held that a district court reviewing a PUC decision may appropriately look to the State Administrative Procedure Act for more specific guidelines relative to judicial review. *Home Builders Ass'n. v. Public Utilities Comm'n.*, 720

P.2d 552, 559–60 (Colo.1986).[7] In this case, the district court invalidated the PUC decision solely on the basis that the order of revocation was not "just and reasonable." Consequently, we need only consider that standard in resolving this appeal.

Although we have applied the "just and reasonable" standard of review to the PUC's ratemaking decisions, *see, e.g., Colorado Municipal League v. Public Utilities Comm'n.*, 687 P.2d 416 (Colo.1984) (statutory mandate that all public utility charges be "just and reasonable" requires the PUC to balance the investor's interest in avoiding confiscation and the consumer's interest in prevention of exorbitant rates); *Public Service Co. v. Public Utilities Comm'n.*, 644 P.2d 933 (Colo.1982) (fixing of "just and reasonable" rates requires a balancing of investor and consumer interests), we have not had occasion to apply this standard to the PUC's sanctioning authority. The imposition of an administrative sanction by the PUC involves a weighing of various factors, including the culpability of the violator, the seriousness of the violation, the public interest in requiring motor vehicle carriers to comply with the rules and orders of the PUC, the effect of the sanction upon the violator, and any other matters disclosed by the evidence. Since the PUC has special expertise in public utility regulation, a reviewing court should accord substantial deference to the PUC's selection of a particular sanction over some other alternative. *See generally Mountain States Telephone and Telegraph v. Public Utilities Comm'n.*, 763 P.2d 1020, 1030 (Colo.1988); *Rumney v. Public Utilities Comm'n.*, 172 Colo. 314, 317–320, 472 P.2d 149, 151–52 (1970). This is not to say, however, that the imposition of a particular sanction is beyond all judicial scrutiny.

■ We hold that for purposes of judicial review pursuant to section 40–6–115(3), 17 C.R.S. (1984), a sanction imposed by the PUC is to be deemed "just and reasonable" if the sanction is within the PUC's statutory authority, if the sanction has a rational foundation in the facts as found by the PUC, and if the sanction is fairly proportionate to the seriousness of the violation in view of all the circumstances of the case. On the other hand, if judicial review of the record demonstrates that the sanction is in excess of the PUC's authority, that the sanction lacks a rational foundation in the factual findings of the PUC, or that the sanction is clearly disproportionate to the violation, the sanction may be set aside.

■ In this case, the district court expressly acknowledged that the order of revocation was not in excess of the PUC's authority and was supported by the record,[8] but nonetheless set aside the order because, in its view, the sanction of revocation was too harsh. In so doing, the district court relied upon factors which were legally insufficient to invalidate the PUC's

7. Section 24–4–106(7), 10A C.R.S. (1988), of the State Administrative Procedure Act contains the following guidelines for judicial review of agency action: whether the agency action is arbitrary or capricious; whether it is a denial of a statutory or constitutional right or privilege; whether it is in excess of the agency's statutory jurisdiction or authority; whether it is in accord with the procedures required by law; whether it is an abuse or a clearly unwarranted exercise of discretion; whether it is based upon factual findings that are clearly erroneous when the record is considered as a whole; whether it is unsupported by substantial evidence when the record is considered as a whole; or whether it is otherwise contrary to law.

8. There is no question in this case that the order of revocation was within the express authority of the PUC. Section 40–10–112, 17 C.R.S. (1984), authorizes the PUC to suspend, revoke, alter, or amend a motor vehicle carrier certificate "when it is established to the satisfaction of the commission that the [holder of such certificate] has violated any of the provisions of [The Public Utilities Law] or violated or refused to observe any of the proper orders, rules, or regulations of the commission." Rule 3 of the PUC Rules and Regulations Governing Common Carriers by Motor Vehicles, 4 CCR 723–8, at 1 (1977), prohibits a common carrier from operating without PUC authorization. The Public Utilities Law also authorizes the PUC to revoke, suspend, alter, or amend the permit of a contract carrier for violation of the terms and conditions of the permit, for exceeding the authority granted by the permit, or for violating or refusing to obey the rules or the orders of the PUC. § 40–11–110, 17 C.R.S. (1989 Supp.). The district court in this case expressly acknowledged in its ruling that the order of revocation was not in excess of the PUC's authority and was supported by the record.

decision. Although, as the district court noted, the stipulated settlement agreement was approved by the PUC staff, NFS and the intervening common carriers, it is the PUC, and not the PUC staff, which is responsible for decisionmaking under the Public Utilities Law. We cannot say that the PUC acted "unjustly or unreasonably" simply because it rejected a recommendation made by its staff. So too, the fact that one member of the PUC dissented from the order of revocation does not demonstrate, or even suggest, that the PUC acted in an arbitrary or capricious manner. Although the district court expressed a concern that the order of revocation probably would result in NFS going out of business, that result, if it occurs, would be solely attributable to NFS's repeated violations of its operating authority. Under the facts of this case, the concern voiced by the district court did not justify a judicial displacement of the PUC's decision to revoke NFS's operating authority. Finally, although the stipulated settlement agreement provided for the revocation of a portion of NFS's certificate of authority—namely, its authority to transport "on call and demand" new and used auto parts from Denver to all points within the state—it was for the PUC to decide whether some sanction less than total revocation would unduly depreciate the seriousness of the violations committed by NFS.

The record before us leaves no doubt that the order of revocation imposed on NFS was in accordance with the statutory authority of the PUC, was rationally related to the frequency of NFS's violations and its prior record, and was fairly proportionate to the seriousness of the violations under the total circumstances of the case. We thus conclude that the district court erred in setting aside the order of revocation.

The judgment is accordingly reversed, and the case is remanded to the district court with directions to reinstate the PUC's order of revocation.