ACE WEST TRUCKING, INC., a
Colorado corporation,
Petitioner–Appellant,

v.

The PUBLIC UTILITIES COMMISSION
OF the STATE OF COLORADO and
Briant Hacking, d/b/a G & K Trucking,
Respondents–Appellees.

No. 88SA456.

Supreme Court of Colorado,
En Banc.

March 12, 1990.

Williams & Isley, P.C., Dale E. Isley, Denver, for petitioner-appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., and Peter J. Stapp, Asst. Atty. Gen., Denver, for respondent-appellee Public Utilities Com'n of the State of Colo.

Law Office of Nancy P. Bigbee, Nancy P. Bigbee, Denver, for respondent-appellee Briant Hacking, d/b/a G & K Trucking.

Chief Justice QUINN delivered the Opinion of the Court.

Ace West Trucking, Inc. (Ace West) appeals from a judgment of the Denver District Court affirming a decision of the Public Utilities Commission (PUC) to grant a motor vehicle contract carrier permit to Briant Hacking, doing business as G & K Trucking (G & K).[1] The district court, referring to the standard of review contained in C.R.C.P. 106(a)(4)(I), ruled that the PUC did not exceed its jurisdiction or abuse its discretion in granting the permit and that there was competent and adequate evidence in the record to support the PUC's decision. We conclude that, although the district court incorrectly utilized C.R.C.P. 106(a)(4)(I) in reviewing the PUC's decision, the record as a whole demonstrates that the PUC validly exercised its regulatory authority in granting the motor vehicle carrier permit and that its decision is supported by substantial evidence when the record is considered as a whole. We accordingly affirm the judgment.

I.

On March 24, 1986, Briant Hacking, doing business as G & K, filed an application with the PUC for a motor vehicle contract carrier permit to operate as a contract carrier for hire pursuant to section 40–11–103, 17 C.R.S. (1984). The application requested authority to transport "oilfield equipment within a 30–mile radius of Rangely, Colorado," limited to one customer, namely Chevron USA.

Several common carriers, including Ace West, filed protests to G & K's application.[2] Ace West is a common carrier operating under a certificate of public convenience and necessity which authorizes Ace West to transport equipment and supplies used in connection with the production of oil and natural gas within a 30–mile radius of Rangely, Colorado. Ace West contended that G & K's proposed services would duplicate and impair Ace West's services.

A hearing examiner conducted a hearing on G & K's application on September 30, 1986. Briant Hacking, testifying in support of his application, described his prior

---

1. Appellate review of a district court decision affirming, setting aside, or modifying any decision of the Public Utilities Commission lies with this court. Section 40–6–115(5), 17 C.R.S. (1984).

2. Other common carriers protesting G & K's application and intervening in the action were Groendyke Transport, Inc., Target Trucking, Inc., and Flint Engineering and Construction Co. On September 26, 1986, Groendyke Transport and Target Trucking sought to amend G & K's application by including two restrictions which the PUC accepted, whereupon Groendyke and Target withdrew their protests. Flint Engineering continued to protest G & K's permit, but did not appeal the district court judgment to this court and is not a party to these proceedings.

experience in oil well operations and stated that he began trucking operations in 1981 by "leasing out" his winch truck to Ashworth Transfer, Inc., a Utah company, which held a PUC certificate of public convenience and necessity.[3] Under the leasing agreement with Ashworth Transfer, Hacking transported oil rigs for Chevron in the Rangely area. According to Hacking's testimony, he was approached in 1984 by an individual from Chevron who requested that he provide roustabout services for Chevron. Roustabout services, as described by Hacking, involve cleaning an oil drilling location after the company has completed the drilling operations, disposing of trash, cleaning fiberglass tubing, assembling and installing safety devices at the site, reading wellheads, and making reports on wellhead readings. Hacking has performed these roustabout services since 1984 pursuant to a series of six-month contracts with Chevron. He charged Chevron directly for these services and also continued to conduct trucking services pursuant to his leasing agreement with Ashworth Transfer[4] and its successor in interest, Savage Brothers. At the time of the hearing Hacking was operating with five trucks and two trailers. At least two of his trucks were stationed at Chevron's facilities in Rangely, and the other trucks and all of G & K's drivers were used exclusively to service Chevron. Hacking and his employees were available seven days per week on a 24–hour per day basis. Hacking maintained contact with Chevron by mobile telephone and by a radio which Chevron had installed in his pickup truck in order to provide Hacking with 24–hour contact capability. Hacking submitted into evidence a traffic study indicating that he makes approximately forty to sixty trips a month to the Rangely area for Chevron. He also stated that some of the services he was presently performing for Chevron, particularly the roustabout services and the installation of certain safety devices, were not performed by other rig-moving companies in the area.

Testifying in opposition to G & K's application was W.R. Burgett, the president of Ace West. Burgett testified that Ace West employs three truck drivers who are fully trained to transport oil field commodities and are available 24 hours a day to provide transportation services in the Rangely area. Although Ace West does not provide roustabout services, Burgett stated that Ace West would attempt to do so if Chevron would make such a request. Burgett also testified that in his opinion the granting of G & K's application would result in the loss to Ace West of approximately 45 to 50 percent of its intrastate shipping business.

The hearing officer recommended that G & K's application be denied on the basis that G & K had failed to establish that its proposed service was "distinctly different or superior to that of authorized common carriers." G & K filed exceptions to the recommended decision. The PUC initially denied G & K's exceptions and adopted the hearing examiner's recommended decision. G & K, however, filed a motion for reconsideration. Upon reconsideration the PUC, in a 2–1 decision, granted G & K's application for a contract carrier permit. The PUC found in pertinent part that Chevron has a need for the transportation and ancillary non-transportation services performed by G & K and that G & K "has established that its proposed service would be distinct-

---

3. Leasing arrangements are sanctioned by Rule 9 of the PUC Rules Governing Contract Carriers. 4 CCR 723–23 at 15–16 (1986). Rule 9(b) provides that "[d]uring the existence of the lease, the lessee shall have full discretion and complete control of each motor vehicle, and will be fully responsible for its operation, in accordance with applicable law and regulations, as if lessee were the owner of the vehicle, including the requirements of safety and inspection of equipment and insurance coverage."

4. Hacking testified that sometime in 1985, while transporting oil field equipment, he was stopped by a Rangely law enforcement officer. The officer told him that he could not use his vehicle one day for leasing services and the next day for roustabout services, and that once a vehicle is leased, the vehicle must remain leased until the lease is terminated. It was after this incident, according to Hacking, that he began billing all trucking and roustabout services for Chevron through Ashworth Transfer and later decided to file his application with the PUC for a motor vehicle contract carrier permit.

ly different and superior to the service now provided by common carriers" in the following particulars: G & K's dedication of its equipment, drivers, and service to one customer only, Chevron; G & K's ability to remain in constant in-vehicle radio communication with Chevron; G & K's entry into a binding bilateral agreement with Chevron; and G & K's performance of roustabout service as part of, or ancillary to, its transportation service to Chevron. Utilizing the guidelines of Rule 3 of the PUC Rules Governing Contract Carriers by Motor Vehicle,[5] the PUC concluded as follows:

1. The proposed transportation services sought to be offered by the Applicant are distinctly different or superior to that of authorized common carriers.

2. The proposed transportation services are specialized and tailored to the distinct or superior transportation needs of Chevron, and the existing common carriers are not ready, willing, and able to provide the proposed service.

3. The granting of this application will not impair the efficient public service of common carriers serving the same area.

4. The Applicant is fit and able to perform the proposed service.

After its application for reconsideration was denied, Ace West applied to the district court for a writ of certiorari pursuant to the Public Utilities Law, § 40–6–115(1), 17 C.R.S. (1984), claiming, inter alia, that the PUC acted in excess of its regulatory authority in considering G & K's proposed roustabout services to Chevron in granting G & K's application and that the PUC's decision was not supported by substantial evidence in the record as a whole. The district court, utilizing a C.R.C.P. 106(a)(4)(I) standard of review, affirmed the PUC's decision on the basis that the PUC did not exceed its authority in considering G & K's ancillary roustabout services and that there was adequate and competent evidence to support the PUC's decision.[6]

5. In its ruling the PUC noted that this court's decision in *Pollard Contract Co. v. Public Utilities Comm'n*, 644 P.2d 7, 11 n. 3 (Colo.1982), had approved the following guidelines for issuing a contract carrier permit:

A. The applicant for a contract carrier permit must first establish that the transportation to be performed is within the definition of contract carrier by motor vehicle, § 40–11–101(3), C.R.S. This is proved in the following manner: there is a presumption that the proposed service constitutes common carriage, and the method of overcoming this presumption is to establish that the proposed service to a particular potential customer is distinctly different or superior to that of authorized common carriers.

B. The Applicant for a contract carrier permit must establish the existence of a present or future private or personal need, which transportation need must be distinctly different or require service superior to that as currently provided or offered by existing common carriers authorized to provide said service.

C. Applicant must establish [the] inadequacy of the common carriers to handle the proposed service. The proper procedure[,] therefor[e], is for the Applicant first to demonstrate that the undertaking it proposes is specialized and tailored to a shipper's distinct or superior transportation need. The protestants then may present evidence to show they have the ability as well as the willingness to meet that specialized or distinctively different need. If that is done then the burden shifts to the Applicant to demonstrate that it is better equipped to meet the distinct or superior needs of the shipper than the protestants. The protestant must establish that the proposed operation of the contract carrier will impair the efficient public service of common carriers serving the same area.

D. The Applicant for a contract carrier permit must establish that it is fit and able to perform the proposed service.

The presently existing guidelines for the issuance of a contract carrier permit are in Rule 3 of the PUC Rules for Contract Carriers by Motor Vehicle. 4 CCR 723–23, at 7 (1986).

6. In affirming the PUC's decision, the district court initially quoted the standards of review in section 40–6–115(3), 17 C.R.S. (1984), of the Public Utilities Law and then, referring to C.R.C.P. 106(a)(4)(I) as the standard of review applicable to this case, ruled as follows:

The Petition alleges that the P.U.C. erred in the following findings: (1) That the Respondent's services were distinctly different or superior to that of authorized common carriers; (2) That Chevron needed Respondent's services; (3) That Petitioner's services were inadequate to meet Chevron's needs; (4) That Respondent's services could not impair the Petitioner's existing services; and (5) That the Commission had jurisdiction over Respondent's non-transportation-type services.

The P.U.C. made determinations which are subject to dispute; however, there is competent evidence in the record to support those

In appealing from the judgment, Ace West claims that the district court erred in resorting to C.R.C.P. 106(a)(4)(I) as the standard of review of a PUC decision and, in addition, questions the PUC's authority to consider G & K's offer to perform roustabout services in granting G & K's application for a contract carrier permit and further asserts that the PUC's decision is not supported by substantial evidence in the record. We address these arguments in turn.

## II.

We first consider Ace West's claim that the district court committed error in utilizing C.R.C.P. 106(a)(4)(I) as the standard of review in affirming the PUC's decision. We find no reversible error in this case.

■ The district court in its ruling initially referred to the statutory standards of judicial review contained in section 40–6–115(3), 17 C.R.S. (1984), of the Public Utilities Law, but then stated that it would apply C.R.C.P. 106(a)(4)(I) in its review of the PUC decision. C.R.C.P. 106(a)(4)(I)

states that "[r]eview shall be limited to a determination of whether the body [exercising quasi-judicial functions] ... has exceeded its jurisdiction or abused its discretion based on the evidence in the record before the defendant body." Section 40–6–115(3), in contrast, states that a district court's review of a PUC decision shall be limited to a determination of whether the PUC regularly pursued its authority (including a determination of whether the decision under review violates any federal or state constitutional right), whether the PUC's decision is just and reasonable, or whether the PUC's conclusions are in accordance with the evidence.

■ We have held that section 40–6–115, rather than C.R.C.P. 106(a)(4)(I), provides the controlling standards of judicial review for district court review of a PUC decision. *Silver Eagle Services, Inc. v. Public Utilities Comm'n*, 768 P.2d 208, 213–14 (Colo. 1989); *Mountain States Telephone and Telegraph Co. v. Public Utilities Comm'n*, 182 Colo. 269, 283, 513 P.2d 721, 728 (1973).

determinations, and the Court may not substitute its judgment for that of the P.U.C.

The P.U.C. found the Respondent's services to be distinctly different and superior, for reasons cited in its June 5, 1987 opinion. There's competent evidence in the record as a whole to support the P.U.C.'s conclusions that G & K demonstrated different and superior services and that Ace West was not providing the same services. It is not for the Court to reassess that evidence. The decision as to the weight to be placed on the evidence is uniquely within the province of the P.U.C. and the Court will not substitute its judgment for that of the P.U.C. ...

Similarly, there was competent evidence presented that Chevron had a special need for distinctly different and superior service. There was testimony that G & K had been approached by Chevron and had a contract with Chevron. Petitioner urges that the evidence was not competent because the shipper's sworn testimony was not presented and such sworn testimony is anticipated by federal case law. The Court feels that what may be anticipated by federal case law is not required by Colorado case law. The Court feels that *P.U.C. versus Donahue*, found at [138 Colo. 492], 335 P.2d 285 (Colo.1959), does apply in this matter and that shippers may testify but their testimony is not mandatory. The Court further feels that the weight of the evidence and the credibility of the evidence presented

on this point was within the province of the P.U.C., and again, the Court cannot re-weigh the evidence or submit its own judgment for the credibility of that evidence.

The Commission determined that the Respondent's proposed service would not impair the efficient public service of the common carriers in the same area. The Commission reviewed the evidence and found that the Petitioner did not carry its burden of proving impairment. Again, it is not for the Court to disturb the Commission's factual finding when they are based on competent evidence in the record.

This Court also feels that the Commission did not exceed its jurisdiction by considering ancillary non-transportation services. The Court feels, again, that Rule 16(d) applies. Rule 16(d) of the Rules and Regulations Governing Contract Carriers by Motor Vehicle came into effect in July of 1986. It allows consideration of ancillary non-transportation services, and P.U.C. made similar findings in this case. Although Rule 16 was not in effect at the time of this application, it is consistent with the standards in *Pollard* and *Denver Cleanup Services*.

Therefore, it is this Court's conclusion that the record as a whole indicates that there was competent evidence to support the decision by the Commission, and, therefore, the Court affirms the decision of the Public Utilities Commission.

Because the statutory standards in section 40–6–115(3) are somewhat general, however, a district court reviewing a PUC decision may appropriately look to the State Administrative Procedure Act for more specific guidelines relative to the standards for judicial review. *Home Builders Assoc. v. Public Utilities Comm'n*, 720 P.2d 552, 559–60 (Colo.1986); *accord News & Film Service, Inc. v. Public Utilities Comm'n*, 787 P.2d 169, 172 (Colo.1990). The more specific guidelines of the State Administrative Procedure Act applicable to judicial review of agency action include whether the agency action is in excess of the agency's statutory jurisdiction or authority and whether the administrative decision is unsupported by substantial evidence when the record is considered as a whole. § 24–4–106(7), 10A C.R.S. (1988).

■ The district court in this case considered and ruled on whether the PUC acted in excess of its authority and whether the record supported the PUC's decision, and the court did so solely on the basis of the record certified by the PUC. *See* § 40–6–115(2), 17 C.R.S. (1987) (in judicial review of a PUC decision, no new or additional evidence may be introduced in district court, and case must be resolved on basis of record certified by PUC). Because these two issues addressed by the district court constituted the essence of Ace West's petition for certiorari filed in the district court, we conclude that the district court's inappropriate reference to C.R.C.P. 106(a)(4)(I) should not be deemed reversible error as a matter of law if the record as a whole demonstrates that the district court could not have resolved Ace West's claims any other way under the controlling standards for judicial review of a PUC decision. *See McDonald v. People*, 29 Colo. 503, 69 P. 703 (1902) (if trial court's decision is correct, it is immaterial what reason the court gave for its conclusion unless the record shows, due to the court's reliance on improper reason, that the party adversely affected by decision was thereby prejudiced); *cf. Consolidated Oil & Gas, Inc. v. Superior Oil Co.*, 157 Colo. 86, 401 P.2d 89 (1965) (where proper grounds exist to compel the entry of judgment, fact that trial court assigned an erroneous reason for its conclusion does not warrant reversal). We turn then to consider whether Ace West's claims regarding the regulatory authority of the PUC and the sufficiency of the evidence have any merit under the record before us.

### III.

■ Ace West asserts that the PUC exceeded its regulatory authority by considering G & K's proposed roustabout services in granting G & K's application for a contract carrier permit. We find this argument devoid of merit.

As pertinent to the issue before us, a "contract carrier by motor vehicle" means every corporation or person owning, controlling, operating or managing any motor vehicle in the business of transporting property of others over any public highway of the state between fixed points or over established routes "by special contract or otherwise." § 40–11–103(3), 17 C.R.S. (1984). "A contract carrier generally furnishes transportation services for pay at the convenience of, and subject to a satisfactory agreement with its customer," while a common carrier is "required by law to provide transportation services to all members of the public upon payment of the approved rate." *Regular Route Common Carrier Conf. v. Public Utilities Comm'n*, 761 P.2d 737, 740 (Colo.1988); *see also Denver Cleanup v. Public Utilities Comm'n*, 192 Colo. 537, 540, 561 P.2d 1252, 1253 (1977). The Public Utilities Law provides that "[e]very contract carrier is forbidden, by discrimination or unfair competition, to destroy or impair the service or business of any motor vehicle common carrier or the integrity of the state's regulation of any such service or business." § 40–11–105(2), 17 C.R.S. (1984). The PUC is charged with the responsibility of prescribing rules and regulations necessary for the effective administration of this prohibition and also with the responsibility of prescribing rates for contract carriers competing with common carriers, which rates must not be less than the rates prescribed for common carriers for substantially the

same or similar service. § 40–11–105(1) & (2), 17 C.R.S. (1984).

On June 3, 1986, the PUC adopted several amendments to the PUC Rules Governing Contract Carriers by Motor Vehicle. *See Regular Route Common Carrier Conf.*, 761 P.2d at 740. Included in these amendments was Rule 16(d), which was added to the PUC's proposed rules during a rulemaking hearing conducted prior to the PUC's final adoption of the rule. Rule 16(d) states as follows:

> A contract carrier shall be deemed to be in competition with a common carrier who is providing substantially the same or similar service when regular route, scheduled, line haul, common carrier service is available for the same or similar commodities between the same points and locations proposed in the application for a permit. Although they may be included among the factors to be considered in determining whether or not the services of contract carriers are distinctly different or superior to those provided by authorized common carriers, *the fact that a contract carrier provides distinctly different or superior service to that offered by authorized common carriers by providing, for example, more frequent service, 24–hour service, ancillary non-transportation services, or service to a particular location, for example, does not necessarily render the service of a contract carrier noncompetitive.*

4 CCR 723–23, at 31 (1986) (emphasis added).

■ The terms of Rule 16(d) make clear that a contract carrier's ability to provide ancillary non-transportation services does not "necessarily render" the contract carrier's service "noncompetitive" in relation to a common carrier's service. This is not to say, however, that the PUC may not consider a contract carrier's ancillary non-transportation services in determining

whether the contract carrier is offering "a distinctly different or superior service to that offered by an authorized common carrier." Indeed, prior to the PUC's adoption of Rule 16(d), this court upheld the authority of the PUC to consider evidence of ancillary non-transportation services of a contract carrier in determining whether the contract carrier was providing substantially the same or similar service as the contract carrier. *See Denver–Climax v. Jim Chelf, Inc.*, 167 Colo. 69, 445 P.2d 399 (1968) (evidence supported PUC's determination that contract carrier was not offering substantially the same service as common carrier but rather was offering a "customer service" pursuant to which highly trained drivers would string concrete pipe along the proposed route encompassing points served by common carrier).

Moreover, in *Regular Route Common Carrier Conf.*, 761 P.2d 737, we distinguished between an "administrative rule," which is legislative or substantive in character, and an "interpretative rule," which "serves the advisory function of explaining the meaning of a word or phrase in a statute or other rule, and describes the type of factors which an agency will consider in future administrative proceedings without, however, binding the agency to a particular result." *Id.* at 748–49. We went on to hold in that case that Rule 16(d) was an "interpretative" rule that merely explained "the meaning of the term 'competition' as related to contract carriers and common carriers providing substantially the same or similar service." *Id.* at 749. Because Rule 16(d) was adopted as an "interpretative" rule and became effective prior to the September 30, 1986, hearing on G & K's application for a contract carrier permit, it was proper for the PUC to consider G & K's ancillary roustabout services in determining whether G & K's proposed services would be distinctly different from or superior to the services provided by authorized common carriers.[7]

7. Ace West argues that because the title of Rule 16 is "Rates and Charges," Rule 16(a) applies only when the PUC is required to determine the rates and charges applicable to a contract carrier that is in competition with a common carrier.

Although Rule 16(d) obviously applies to a determination of rates and charges, we recognized in *Regular Route Common Carrier Conf. v. Public Utilities Comm'n*, 761 P.2d 737, 750 n. 9 (Colo.1988), that the rule was also intended to

## IV.

Ace West also argues that the PUC's decision is not supported by substantial evidence. Specifically, Ace West claims that the evidence does not support the PUC's conclusions that Chevron has a need for G & K's proposed services, that these services would be distinctly different from or superior to services now offered by Ace West or other common carriers, and that granting a contract carrier permit to G & K would not impair Ace West's common carrier services. We are unpersuaded by Ace West's argument.

### A.

■ Under the Public Utilities Law, the standard for reviewing a sufficiency of evidence claim is whether the PUC's conclusions "are in accordance with the evidence." § 40–6–115(3), 17 C.R.S. (1984). Because this standard does not provide guidance on the specific quantum of evidence necessary to support a PUC decision, our prior cases have utilized the "substantial evidence" standard of the State Administrative Procedure Act, § 24–4–106(7), 10 C.R.S. (1982), as the controlling norm for determining whether a PUC decision has adequate support in the evidence. *E.g., Colorado Municipal League v. Mountain States Telephone and Telegraph Co.,* 759 P.2d 40 (Colo.1988); *Atchison, Topeka & Santa Fe Railway Co. v. Public Utilities Comm'n,* 763 P.2d 1037 (Colo.1988); *G & G Trucking, Co., Inc. v. Public Utilities Comm'n,* 745 P.2d 211 (Colo.1987); *Home Builders Ass'n,* 720 P.2d at 552. We recently construed the term "substantial evidence" as follows:

explain the term "competition" and had as one of its purposes the alleviation of "the difficulties experienced in determining the question of competition between [contract carriers] and common carriers providing the same or similar service." *Id.* In light of this purpose, there can be no doubt that the PUC properly considered the factors in Rule 16(d), including the "ancillary non-transportation services" proposed by G & K in resolving G & K's application for a contract carrier permit.

Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," . . . and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.

*Colorado Municipal League,* 759 P.2d at 44 (quoting *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939). Whether there is substantial evidence to support a PUC decision is a question of law, and in resolving that question of law a reviewing court must view the record in a light most favorable to the PUC decision. *E.g., Atchison, Topeka & Santa Fe Railway Co.,* 763 P.2d at 1041; *G & G Trucking,* 745 P.2d at 216.

### B.

■ When the record in this case is analyzed under the aforementioned guidelines, we are satisfied that there is substantial evidence to support the PUC's decision.[8]

#### 1.

There is substantial evidence in the record to support the existence of a present need on the part of Chevron for G & K's proposed services. Briant Hacking testified that in 1984 a person from Chevron had asked him about the possibility of providing roustabout services for Chevron. Hacking further testified that he contracted directly with Chevron for the services while also continuing to conduct trucking

8. In its brief Ace West states, in the form of an unsupported conclusion, that the PUC's decision is arbitrary, capricious, unjust, unreasonable, an abuse of discretion, and is otherwise contrary to law. These conclusory claims are not particularized by legal argument or by reference to any matter of record. Consequently, we limit our discussion to Ace West's claim that the PUC's conclusions on Chevron's need for G & K's services, the distinctly different or superior service offered by G & K, as well as the absence of impairment to Ace West's business, are not supported by substantial evidence in the record.

services under his leasing agreement with Ashworth Transfer and Ashworth's successor in interest.

■ Ace West argues that Chevron's need for G & K's services could only be established by testimony of a shipper in need of the services—Chevron in this case—and not by the testimony of Hacking alone. The testimony of a shipper, however, is not indispensable to the grant of a contract carrier permit. *See Public Utilities Comm'n v. Donahue*, 138 Colo. 492, 503–04, 335 P.2d 285, 290–91 (1959). What is essential is sworn testimony, which may be supplemented by other evidence, sufficient to provide a substantial basis for the PUC's decision. *Id.* Not only did Hacking's testimony satisfy this requirement, his testimony on Chevron's need for G & K's services was supplemented by the testimony of Bill Irby, a supervisor for another company which operated a rig service under a contract with Chevron. Irby testified that when Chevron needed rig service, Irby would call Hacking to move the rig to the location designated by Chevron. The evidentiary state of the record clearly demonstrates the existence of a present or future need on the part of Chevron for the services proposed by G & K.

2.

The record also contains substantial evidence demonstrating that G & K's proposed services would be distinctly different from or superior to the services authorized by common carriers. Hacking's testimony established that G & K is the only company in the area which would provide roustabout services to Chevron in connection with transportation services. Moreover, Hacking testified that G & K would contract with Chevron for the services,[9] would dedicate its equipment and personnel exclusively to servicing Chevron's needs, and would

maintain constant in-vehicle communications with Chevron. No other common carrier in the area was offering such specialized services to Chevron. Under this state of the record, there can be no question that the PUC properly concluded that G & K's proposed services are "specialized and tailored to the distinct or superior transportation needs of Chevron" and that "the existing common carriers are not ready, willing, and able to provide the proposed service."

3.

The record also contains substantial evidence to support the PUC's conclusion that granting a contract carrier permit to G & K would not impair Ace West's common carrier service in the area. Ace West's argument to the contrary ignores the fact that G & K, prior to filing its application for a contract carrier permit, had been providing transportation and roustabout services through continuous six-month contracts with Chevron and that, so far as the record shows, there was no impairment to the service of Ace West or other common carrier during this period of time.

It was incumbent upon Ace West, as the protestant to G & K's application, to establish that G & K's proposed operation would impair Ace West's efficient common carrier service. Rule 4(c), PUC Rules for Contract Carriers by Motor Vehicle, 4 C.C.R. 723–23, at 9 (1986). Although W.B. Burgett, the president of Ace West, offered his opinion that his company would lose significant revenues as a result of G & K's application, it was the prerogative of the PUC to weigh this evidence, along with other evidence in the case, in determining whether Ace West carried its burden on the issue of impairment. While the PUC might have drawn an alternative inference from Burgett's testimony, we cannot say as a matter of law

9. Ace West contends that the record contains insufficient evidence of Chevron's intent to contract with G & K for the proposed services because G & K was operating under a lease agreement with Ashworth Transfer's successor in interest. The record, however, is clear that Chevron requested G & K to provide the proposed services and that in the past Hacking had entered into a series of six-month contracts with Chevron to provide these very same services. This evidence is adequate to support the PUC's reliance on the contractual agreement between G & K and Chevron as one of several factors for concluding that G & K's services were distinctly different or superior to the services offered by authorized common carriers.

that it erred in concluding that the granting of G & K's application would not impair Ace West's common carrier service.[10]

The judgment is affirmed.

10. In its answer brief, G & K requests that we assess attorney fees against Ace West for filing a frivolous appeal. Ace West's appeal is not frivolous, *see Mission Denver Co. v. Pierson*, 674 P.2d 363 (Colo.1984), and we accordingly deny G & K's request.